STATE v. ALPHONSO RHYNE.

(Decided May 9, 1899).

*Murder—1st and 2nd Degree—Evidence of Deliberation and Premeditation—Act of 1893, Chap. 85.*

1. At common law, the intentional killing of a human being with a deadly weapon, nothing more appearing, was murder, malice being presumed from the facts.

2. By the Act of 1893, chapter 85, the crime of murder has been divided into two degrees, first and second. The common law definition and description are still applicable to the crime in the second degree; but it takes more than this to constitute murder in the first degree—the killing must be wilful, deliberate and premeditated, and this must be shown by the State beyond a reasonable doubt before it is justified in asking a verdict of guilty of murder in the first degree.

3. The law is fixed by the statute, that the killing must be wilful, upon premeditation and with deliberation, and where there is no evidence tending to prove this, the jury should be so instructed, and the question of guilt on the charge of murder in the first degree ought not to be submitted to them.

INDICTMENT for murder, tried before *Coble, J.*, at Spring Term, 1899, of GASTON Superior Court.

The prisoner was indicted for the murder of Thomas G. Falls. The evidence is fully stated in the opinion.

Among the special instructions asked by the prisoner were the following:

8. In no aspect of the testimony and under no reasonable inference that can be fairly drawn from it, is the prisoner guilty of murder in the first degree.

9. At most the jury can only convict of murder in the second degree.

11. There is no evidence of deliberation and premeditation in this case.

His Honor declined to give these instructions. Prisoner excepted. Verdict of guilty of murder in the first degree. Sentence of death. Appeal by prisoner.

*Mr. D. W. Robinson,* for prisoner.
*Mr. Zeb. V. Walser,* Attorney General, and *Jones & Tillett,* for the State.

FURCHES, J., delivers the opinion of the Court.
CLARK, J., delivers dissenting opinion.
MONTGOMERY, J., delivers concurring opinion.
DOUGLAS, J., delivers concurring opinion.

FURCHES, J. The prisoner was indicted and convicted of murder in the first degree, and from the judgment of the Court, he appealed. There are some exceptions taken to the charge, but we have examined them with care and do not think they can be sustained. The charge seems to be a full, clear and correct enunciation of the law of murder in the first and second degrees, as it exists under the statute of 1893. . The error, if there be error, is in submitting the question of murder in the first degree to the jury upon the evidence in the case. That Thomas Falls had been killed by the prisoner with a deadly weapon, was clearly shown— indeed not denied. Under the law as it existed before the Act of 1893, malice would have been presumed from these facts, and nothing else appearing the killing would have been murder. The same rule, as to killing with a deadly weapon and the presumption of malice that existed before the Act of 1893, still exists, but is only applicable to murder in the second degree; and the burden is still on the prisoner to show facts in extenuation, mitigation or excuse to reduce the grade of the crime below that of murder in the second degree, or to justify or excuse the killing. As the

killing with a deadly weapon was proved (in fact not denied), and the prisoner having offered no evidence in extenuation, excuse or justification, the Court would have been justified in telling the jury that if they believed the evidence the prisoner was guilty of murder in the second degree.

But since the Act of 1893, Ch. 85, dividing murder into two degrees, these rules of the common law do not apply to murder in the first degree, or, speaking more accurately, it takes more than this to constitute murder in the first degree; that, outside of the specified offence named in the statute, the killing must be "wilful, deliberate and premeditated;" and this must be shown *by the State* beyond a reasonable doubt before it is justified in asking a verdict of guilty of murder in the first degree.

As the case depends upon the sufficiency of the evidence to justify a verdict of murder in the first degree, we think it proper to give the evidence upon which it was found: Mr. Grissom, an employee of the deceased, living and boarding with the deceased, went with him from his house to the cotton gin, and who saw and heard the whole matter, testified "that as he went from the store to his supper, he heard a fuss—a row going on between Frank Parish, an employee of the deceased and the prisoner, who had brought a load of cotton to the gin for a customer. After he got to the house he continued to hear the row going on, when a daughter of the deceased informed her father that a fuss was going on between some persons at the cotton gin; that deceased came out on the piazza where the witness was, stopped a moment and started towards the gin house. Witness went with him and further testified: "Witness went with him to gin house about 25 yards from dwelling. Just across the public road as Falls (the deceased) started up the steps of the platform,

124—54

prisoner was standing on the platform. Prisoner stepped off the platform into a wagon and from there to the ground. Falls went up the steps and asked Frank Parish what the fuss was about. Frank said that a negro had called him a son of a bitch—said that was more than he could take from any negro. Falls told Frank to shut up and go back to his work—there wasn't any use of that. It was Falls' gin house. Frank Parish was working for Falls. Falls then turned and went down the steps—went around the wagon where prisoner was standing by a tree. Falls said 'are you the man that has been fussing here with Frank Parish?' and said this a second time. Prisoner made no answer to first question and he asked him the second time. As he asked him the second time Falls put his left hand on the prisoner's right shoulder or arm and asked him to come to the light, he wanted to find out what all this fuss was about. Just then the prisoner stabbed him and jumped back, and said 'hands off.' Prisoner jumped back about three or four feet. Falls turned to witness and said he has stabbed me and he has ruined me, and he ought not to have done it, and then as soon as Falls spoke to witness, the prisoner ran and Falls turned and went into his house. Witness left him at public road and went to store and 'phoned' for a doctor. Witness was in about two feet of deceased at the time he walked up to prisoner. Prisoner didn't open the knife after Falls got there—he didn't put his hands in his pocket—from time prisoner got off the platform till Falls was stabbed, was about five minutes. Falls spoke to prisoner in a kind way and laid his hands on prisoner just merely to ask him to go round to the light, there was no rudeness about it. Witness saw prisoner no more that night. When Falls was on the platform his manner was gentle—asked Frank what the fuss was about, and Frank said the negro called him a son of a bitch

and this was more than he could take.   It occurred on the 17th of November, 1898, between 6 and 7 o'clock in the afternoon.   Falls lived three days after that."

The witness was then cross examined and testified as follows:   "Witness went up on platform with Falls and went back with him, when he went down off the platform, and followed him around to where prisoner was.   Witness saw prisoner jump off platform into wagon when Falls started up steps—saw him step out of wagon to the ground—didn't see him while witness was on platform talking to Parish.   Witness and Falls both walked up to prisoner.   Falls, before he laid his hands on him, asked prisoner "are you the fellow who has been fussing around here with Frank?' and asked witness, 'What all this fuss was about?'   He laid his hand on him just as he asked him to come around to the light.   Falls knew the prisoner.   Witness had seen prisoner before this time.   Parish said to Falls that the negro, Phonse Rhyne, had called him a son of a bitch, and this was more than he could take from any negro.   Prisoner was in hearing distance of this remark from where he was when witness got to him.   When witness and Falls went around to prisoner, he was 10 or 12 feet from the wagon.   When witness last saw prisoner before he found prisoner, he was stepping off the wagon, and he was then in hearing distance of the remarks of Falls—and at the tree he was in hearing distance, unless the machinery prevented him.   When witness went around to prisoner he was standing by a tree.   As witness and Falls approached from the house, Parish and prisoner were quarreling.   The fuss ceased when Falls started up the platform. Falls, with his left hand, caught the prisoner's shoulder— laid his hand on his shoulder—arm rather.   Falls weighed 225 pounds or 215 pounds—height about 5 feet 11 inches, probably six feet—he was fleshy—not extra active—he was an energetic man—tended to a great deal of business."

STATE v. RHYNE.

We have quoted the entire evidence of this witness, and while there was some other witness examined, there was nothing new elicited. And the evidence of this witness may be said to be the evidence in the case. There was a witness who testified that just after the homicide had taken place, some one ran by him, and he supposed it to be the prisoner (it was dark), saying he would kill him—that he would cut his guts out. And while such evidence might possibly be used to show malice, were that necessary, it is not seen how it can be evidence of premeditation and deliberation, which is the point upon which the case turns.

Probably one of the most difficult things that presents itself to a Judge presiding at the trial of an important case—a capital felony—is to say whether there is such evidence of guilt (in some cases) as should be submitted to the jury. And it is with reluctance that this Court, after the Court below has submitted the matter to the jury and they have found a verdict of guilty, holds that there was no testimony, or no such testimony of the prisoner's guilt as should have been submitted to the jury. But we find that this Court, in the discharge of its duty, has done so in a number of cases. Of the more recent cases we may name *State v. Miller,* 112 N. C., 886; *State v. Thomas,* 118 N. C., 1121; *State v. Wilcox, Ibid,* 1181, and *State v. Gragg,* 122 N. C., 1082. These were all convictions of murder in which new trials were granted upon the ground that the evidence was not sufficient to justify the verdict of guilty.

The law is fixed by the statute, that the killing must be wilful and that it must be done upon premeditation and with deliberation. The statute of 1893 making this change in our criminal law is a very important one, and, like all new statutes of such great importance, it has given this Court trouble to be always able to determine its meaning and to

make a proper application of it to the cases in which it is presented. But since it was passed, it has been presented in quite a number of cases where it has been considered and construed by this Court. It therefore becomes our duty to consider it now in the light of these decisions and apply it to this case.

In civil cases, where the issue depends upon the weight of evidence there must be more than a scintilla of evidence— "there must be evidence from which the jury might reasonably come to the conclusion that the issue was proved." *Wittowsky v. Wasson,* 71 N. C., 451. This case has been cited with approval in *Lyne v. Telegraph Company,* 123 N. C., 123; *Thomas v. Shooting Club, Ibid,* 288; *Spruill v. Insurance Company,* 120 N. C., 141, and many other cases. This being the rule in civil cases, it must be at least this strong in State cases, where the issue does not turn upon the weight of evidence, but where it must be proved *beyond a reasonable doubt.*

The killing with a deadly weapon being proved (not denied) the question is, was this killing done upon premeditation and with deliberation? or, to more correctly state the question presented, is there any evidence "from which the jury might reasonably come to the conclusion" beyond a reasonable doubt that this homicide was committed *upon deliberation and with premeditation?*

In *State v. Fuller,* where the act of 1893 was first considered by this Court, it is said: "The use of a deadly weapon does not *ipso facto* bring the killing within the definition of murder perpetrated by means of poisoning, lying in wait, imprisonment, starving, torture, or by any other kind of wilful, deliberate or premeditated killing." "Probably 99 out of every 100 homicides are caused by the use of a deadly weapon, and if every case where its use is provoked by insult-

ing language (not deemed provocation in law) which is resented with fatal result on the spur of the moment, the offence is presumably murder, but little has been accomplished by the legislative attempt to classify cases which before fell within the definition of murder." In this case, there was an assault and battery, deemed in law provocation.

It is next considered by this Court in the case of *State v. Norwood,* 115 N. C., 789, where the Court uses this language: "In order to convict of murder in the first degree ....it was necessary that the State should show that the prisoner deliberately determined to take the child's life."

Murder under the Act of 1893 is again considered in *State v. Thomas,* 118 N. C., 1113, where it is said: "In order to constitute deliberation and premeditation, something more must appear than the prior existence of malice, or the presumption of malice which arises from the use of a deadly weapon. Though the mental process may require but a moment of thought, it must be shown, so as to satisfy the jury beyond a reasonable doubt that the prisoner weighed and balanced the subject of killing in his mind long enough to consider the reason or motive which impelled him to the Act, and to form a fixed design to kill, in furtherance of such purpose or motive."

In *State v. McCormac,* 116 N. C., 1033, the Act of 1893 is considered and the Court says: "It must have appeared in some aspect of the evidence that the accused deliberately determined to kill the deceased before inflicting the wound, in order to warrant the Judge in submitting the question of his guilt, on the charge of murder in the first degree, to the jury." The same doctrine is held in a number of other cases, but these are sufficient to establish the rule.

The evidence in this case is quoted above, and, in our opinion, does not prove or tend to prove that the killing was done

upon premeditation and with deliberation, tested by the rule, established by this Court.

The prisoner and the deceased knew each other. They were friendly so far as appears from the evidence, until the moment of the homicide. The prisoner was lawfully there— we may say by invitation, as the deceased seems to have been the owner of a public cotton gin, and the prisoner was the servant of one of his customers and had brought a load of cotton to the gin of the deceased. The prisoner and Parish, an employee of the deceased, got into a fuss. The deceased went from his dwelling house to the gin house. The fuss between Parish and the prisoner stopped when the deceased got there. The prisoner left the platform of the gin house and went ten or twelve feet off on the ground, by a tree. It was dark. The deceased and Grissom, an employee of deceased, went to the prisoner, and the deceased said to prisoner, "Are you the fellow who has been fussing around here with Frank Parish?" (Cross examination). The prisoner made no answer, the deceased repeated the question, and as he did so, he placed his hand on the prisoner's shoulder and said, come around to the light and tell him what the fuss was about. At this moment the fatal stroke was made. The prisoner jumped back and said "Hands off."

Where is the evidence of *deliberation* and *premeditation?* It can not be inferred because it was done with a deadly weapon. He was mad but not with deceased, who had seemed to be his friend until the deceased put his hand upon him and said, come around to the light and tell me what this fuss is about. The prisoner being mad, it seems that this assault was the cause of the impulse and the fatal blow. To put any other construction upon this transaction would be unnatural, unreasonable and unwarranted by the evidence in the case.

It was contended by the State that the manner in which the homicide was committed afforded sufficient evidence of deliberation and premeditation to justify the jury in finding a verdict of murder in the first degree, and *State v. Dowden,* 118 N. C., 1145, is cited to sustain this contention. We do not think so. The case of *State v. Dowden,* is easily distinguished from this case. There, Dowden was unknown to the deceased—had gone upon the deceased's engine without permission—was a·trespasser—was ordered off and refused to go—was put off by the deceased, but he did not give the fatal blow at that moment. After the prisoner got on the ground he claimed to have dropped his hat, and asked the deceased to hold his lantern so he could find his hat, which the deceased did, when the prisoner picked up his hat, the deceased turned around, and the prisoner shot him in the back. The simple statement of the facts makes the distinction between that case and this so apparent, that we will not discuss it.

After a full consideration of this case we are compelled to order a new trial for the reason that we are of the opinion there is no evidence to support a verdict for murder in the first degree.

New trial.

Clark, J., dissenting. This case was tried by a careful and a painstaking Judge and by a jury that was unexceptionable to the prisoner, for no objection was taken by him to any one of them. The charge as to the distinction between murder in the first degree and murder in the second degree, was very clear and explicit, and the jury could not have misunderstood it and it is not even alleged that they were misled. Though the Judge thought there was sufficient evidence to submit the case to the jury upon the phase of murder in the first degree and the twelve jurors were each of opinion that

the prisoner beyond a reasonable doubt was guilty of murder in the first degree as explained by the Court, we are asked to overrule both Judge and jury. It should be a very plain case that would justify such interference with the province of the jury and with the ordinary course of justice.

The Act of 1893 divided murder into the 1st and 2nd degrees, a very proper step, if it can be admissible for the Court to approve—since it has no right to disapprove—legislative action. There was nothing on the face of the Act transferring to murder in the second degree the presumption of malice aforethought, which by an unbroken line of decisions from the earliest times arose (*State v. Rollins,* 113 N. C., 722) upon the killing being shown to have been done with a deadly weapon, but this Court in *State v. Fuller,* 114 N. C., 885 held that it was transferred and having reiterated it since, we must take it now as settled. These decisions, however, also hold that no particular length of time is necessary to constitute "premeditation." In *State v. Thomas,* 118 N. C., 1113, it is said that to constitute the "premeditation" necessary to constitute murder in the first degree "the mental process may require but a moment of thought." In *State v. Dowden,* 118 N. C., 1145, which very nearly resembles this case in the facts, it is said "The law does not lay down any rule as to the time which must elapse between the moment when the person premeditates, or comes to the determination in his own mind to kill another person, and the moment when he does the killing, as a test. It is not a question of time......In determining the question of deliberation and premeditation, it is competent for the jury to take into their consideration the conduct of the prisoner, before and after, as well as at the time of the homicide, and all the circumstances connected with it."

In *State v. Norwood,* 115 N. C., 879, it is said, that the

jury may find premeditation no matter "how soon after
resolving to do so" the killing is done.   This language is
approved in *State v. McCormac,* 116 N. C., 1033, the Court
holding that as evidence of premeditation the jury might con-
sider "the want of provocation; the preparation of a weapon,
and that there was no quarreling just before the killing"—
the identical evidence that is present in the case at bar—
and the Court adds that it is "such attendant circumstances
which throw light upon the question (of premeditation)
rather than a computation of the time intervening between
the formation and execution of the purpose."   In *State v.
Covington,* 117 N. C., at page 862, it is said, "It is imma-
terial in determining the degree of murder how soon after
resolving to kill the prisoner carried his purpose into execu-
tion."   If a person goes out into the street and without prov-
ocation coolly walks up to another and stabs him and then
flees, surely this is murder in the first degree for the jury
is justified in believing "from the circumstances before and
after" *State v. Dowden, supra,* that the killing was delib-
erate.   In the case at bar, the prisoner had been having a
high quarrel with one of deceased's employees; the deceased
came up and reproved his employee; the prisoner went down
the steps a few feet and stood in the dark with his knife open
and the deceased, the owner of the gin, went down the steps
and up to the prisoner and asked him in a mild manner what
the trouble was, the prisoner made no response, the deceased
then gently, not in a rude manner, laid his hand on the pris-
oner's arm and asked him to come round to the light and tell
him what the fuss was about, whereupon with his open knife,
the prisoner stabbed the deceased in the abdomen, and ran
off crying out loudly "I'll kill him—I'll cut his guts out."
He fled from justice and when sought by the sheriff attempted
to escape by a back door and only stopped after being shot

STATE *v.* RHYNE.

at. The killing could not justly be ascribed to the kind speech of the deceased or his gently laying his hand on prisoner's shoulder. His standing there in the dark with an open knife, his refusing to answer when first spoken to, his killing without any provocation and his immediately running off shouting, "I'll kill him—I'll cut his guts out," and his subsequent flight from justice, were all calculated to satisfy the jury that the "devil was in him" and that while standing there in the dark, brooding over his late quarrel and with his open knife in his hand, he determined to kill whoever approached him. In accordance with the above precedents this was ample time to make it premeditation and justified their verdict.

The declaration of the prisoner was also in evidence that he opened the knife in his pocket. This, if believed by the jury, might well have been considered by them as evidence of deliberation and a determination to slay the deceased, for the knife in that case could not have been opened without premeditation and a formed intention to take the deceased at a disadvantage. The stabbing was not on a sudden impulse, at least there was evidence for the jury tending to prove that it was premeditated.

From the report of the Attorney General to Congress it appear that in the last dozen years the number of homicides in the United States has suddenly risen from 4,000 to 10,500 per annum and for the vast slaughter represented by the last figure, in round numbers 100 were convicted of murder by the Courts and 240 were executed by lynch law—that growing blot upon our civilization. In this State, from the official "Criminal Statistics" on an average there are 150 capital offences per annum, for which on an average 2 are executed by law and 4 are lynched, though doubtless all the lynchings are not reported. In 1894 the Attorney General's report shows

8 lynched and 2 legal excutions, and the next year 2 were lynched, and no execution by law.

Lynch law, evil that it is, is a protest of society against the utter inefficiency of the Courts as above shown to protect the public against murder. It is an evidence that society under that first of laws, the right of self preservation, is endeavoring to protect itself when the costly machinery of Courts has failed of the object of its creation so far as homicide is concerned. The wisest course is not to suppress the facts but to probe the evil and remove the cause.

This inefficiency of the Courts is chiefly due to the failure to adapt legislation as to murder trials to their changed surroundings in other respects. When, as at common law, a prisoner on trial for murder was not allowed the benefit of counsel or to have witnesses summoned on his own behalf or to cross-examine those summoned for the prosecution, the humanity of the judges to "even up" matters invented the disparity of challenges whereby the State is allowed only four peremptory challenges, while the prisoner has 23 without assigning cause, and an unlimited number, of course, if he can show cause. Now that the prisoner has the benefit of counsel, the right to have the compulsory attendance of witnesses on his own behalf and to cross-examine the State's witnesses, and even to be a witness in his own behalf, if he wishes (and freed from comment if he does not) the retention of the enormous disparity of peremptory challenges (23) in his favor enables him to "run" for some one man on the venire who is his friend or the friend of his counsel, or opposed to capital punishment. Further, the prisoner must be proved guilty beyond a reasonable doubt and the doubt of one juror defeats conviction. Besides, the prisoner can except to any ruling or charge of the Court, but the Solicitor for the State can not, and there are other discriminations

in behalf of the prisoner and against the State.  The result is that the gravest and most flagrant murder can rarely be punished if the prisoner or his friends have means to engage able and influential counsel who can utilize the overwhelming advantage given the prisoner in trials for murder.  Attorney Generals Davidson, Osborne and Walser have in their reports called attention to this evil and recommended a reform so as to give the State a fair trial in such cases.  The practical effect of our present system is that a murder, however flagrant, if the prisoner or his friends have money entails merely a sharp fine upon the slayer, imposed for the benefit of some influential and able lawyer in the way of a fee— it is merely this and nothing more.  The heavy expense of the trial all falls upon the defenceless public with the increased insecurity of human life resulting from easy acquittals.  An ideal trial is one in which the innocent has nothing to fear and the guilty but little to hope.  In our murder trials happily we fulfill the first condition but are exceedingly far from the latter.

It is true that this disparity of challenges and other discriminations which prevent the State having a fair showing can only be corrected by legislation (and many States are doing it), but the Courts knowing the overwhelming disadvantages under which the State already labors in attempting to protect society against murderers and the increase of lynchings caused by the inability of the Courts to do this, should be slow to increase the inefficiency of the Courts with the increase of the evil sure to result therefrom, by taking a case from the jury who, upon the evidence and upon a charge in accordance even with *State v. Fuller,* has found that beyond any reasonable doubt, in the mind of any juror, the prisoner slew the deceased with premeditation and malice aforethought.

MONTGOMERY, J., concurring.   In the case of *State v. Gadberry,* 117 N. C., p. 811, (in which the statute of 1893, dividing the crime of murder into two degrees was under consideration) Judge Avery, in his concurring opinion, said: "We are not acting as arbitrators nor as citizens susceptible to the influence of public indignation naturally aroused by such conduct as is attributed to the prisoner, but as a Court supposed to hold the scales of justice too high to be shaken in our purpose, by even our own abhorrence of cruelty." These words of the eminent Judge truly characterize the thought and purpose of the ideal Judge and every judicial officer should in the discharge of his public duties strive to conform to the ideal.   The recital by the witnesses of the circumstances connected with the slaying of the deceased by the prisoner, and the excitement naturally produced thereby, I think, led the Judge into an error; and that being so it is my duty as a member of this Court to say so regardless of any temporary clamor.

By Chapter 85 of The Laws of 1893, murder was divided into two degrees—murder in the first degree and murder in the second degree.   Murder in the first degree, to be punished with death, is described in the first Section of the Act in the following words:   "All murder which shall be perpetrated by means of poison, lying-in-wait, imprisonment, starving, torture, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony shall be deemed to be murder in the first degree and shall be to be punished with death."

The contention of the State is that the prisoner killed the deceased, not by any of the means or under the circumstances mentioned in Section 1 of the Act, but that he killed him in a manner and with a purpose wilful, deliberate and premed-

itated; that the intent of the prisoner was not formed simultaneously with the act of killing, upon the sudden impulse of the moment and at the time when the deceased placed his hand upon the prisoner's shoulder.   The following is the evidence recited from the case on appeal:   "William Grissom:   Was present when Tom Falls was stabbed; saw defendant there. On the way to supper that night I heard two persons fussing; heard defendant tell Frank Parish that he would land him in hell in two minutes if he fooled with him.   Witness went on from the store to supper at Falls' home; went in and started to prepare for supper.   They got louder.   Then witness went out on the steps; was standing listening to the fuss.   By this time Miss Bertha Falls went in and told her father about two persons fussing out there.   Her father was Tom Falls; he came out and as he passed witness he stopped for a moment and walked on.   Witness went with him.   Went to the gin house, about 25 yards from the dwelling house—just across the road.   As Falls started up the steps of the platform defendant was standing on the platform.   Defendant stepped off into the wagon and from there to the ground.   Falls went up the steps and asked Frank Parish what the fuss was about.   Frank said that the negro had called him a son of a bitch—that that was more than he could take from any negro.   Mr. Falls told Frank to shut up and go.back to his work, there wasn't any use of that.

It was Falls' gin house and Parish was working for Falls. Falls then went down the steps, round the wagon to where defendant was.   Falls said, "Are you the man that has been fussing here with Frank Parish? and said this a second time. Defendant made no answer to first question nor the second question.   As Falls asked him a second time he laid his left hand on defendant's right shoulder or arm and asked him to come round to the light, he wanted to find out what all this

fuss was about. Just then the defendant stabbed him and jumped back and said "hands off." Defendant then jumped back two or three feet. Mr. Falls turned to me and said 'he has stabbed me and he has ruined me and he ought not to have done it.' As Falls spoke this to witness, defendant ran and Falls turned and went into his house. Witness left him and phoned for a doctor. Witness was within about two feet of deceased when he walked to defendant. Defendant didn't open the knife after Falls got there; he didn't put his hand in his pocket; from the time he got off the platform till Falls was stabbed was about five minutes. Falls spoke to defendant in a kind way. Falls laid his hand on defendant just to ask him to go around to the light, there was no rudeness about it. Witness saw defendant no more that night. When Mr. Falls went on the platform his manner was gentle; asked Frank what the fuss was about and Frank said the negro had called him a son of a bitch and this was more than he could take. It occurred the 17th of November, 1898, between 6 and 7 o'clock in the afternoon. Falls lived three days after that. On cross examination witness stated that he went on the platform with Falls and went back with him when he went from the platform to where defendant was. Witness saw defendant jump off the platform into a wagon when Falls started up the steps, saw him step out of the wagon to the ground; didn't see him while witness was on the platform talking to Parish. Witness and Falls both walked up to defendant. Falls, before laying his hand on defendant asked him "Are you the fellow who has been fussing around here with Frank," and he asked "What is all this fuss about, come round to the light and tell me what you are fussing about." He laid his hand on him just as he asked him to come round to the light. Falls knew the defendant. Witness has seen defendant before this time. Parish said to

Falls that the negro Rhyne had called him a son of a bitch
and this was more than he could take from any negro.
Defendant was in hearing distance of this remark from where
he was when witness got to him.   When witness and Falls
went to defendant he was 10 or 12 feet from the wagon.
Where witness last saw defendant before he found him, was
when he was stepping off the wagon, and he was then in
hearing distance of the remark of Parish and at the tree he
was in hearing distance unless the machinery prevented him.
When witness went to defendant he was standing by a tree.
As witness and Falls approached from the house Parish and
defendant were quarreling.   The fuss ceased when Mr. Falls
started up the platform.   Mr. Falls with his left hand caught
the defendant's shoulder—laid his hand on his shoulder—
*arm* rather.   Falls weighed 225 pounds or 215, about 5 feet
high, 11 inches—probably six feet.   He was fleshy, not very
active—he was an energetic man—tended to a great deal of
business.

W. Z. Ferguson testified that on the 17th of November
witness was at home 10 minutes after 8 o'clock; he was 30 or
40 yards from the platform when the fighting took place, not
there when the quarrel started; heard quarreling, sounded
like it was in gin house, but never saw Falls when he went
down.   Witness learned that night that Falls was cut.   A
short time before that somebody came running by the wagon
where witness was, about three minutes before witness heard
ladies screaming—not over three minutes and as much as one
minute.   Witness could not tell who it was running, but
thought it was a negro.   He was coming from towards the
gin house; heard him say "I'll kill him, I'll cut his guts out,
damn him," and a good many other words which witness
could not understand.   He went on by the wagon and wit-
ness heard him down the road—heard his steps and his

124—55

voice for 50 or 100 yards.   Cross-examined: Witness knows defendant, never saw him there that evening before the boy or man ran by witness.   Witness had been there not over 10 minutes.   Defendant was working for Boyd.   Defendant said, "I'll kill·him"—words of that kind witness understood. He was in a trot or run; he moved by witness; he said "I'll kill him, I'll cut his guts out."   Witness heard quarreling; didn't know who was quarreling; only a few minutes before he had heard quarreling.   Parish was cursing somebody, witness couldn't tell who; don't think the cursing was as much as five minutes before the running.

Bruce Falls:   Was there the night of the 17th of November with Mr. Ferguson.   Witness heard some cursing; was all he heard and saw a man running; was all he saw; he was going from the gin; he passed in 5 or 6 feet.   He said "I'll cut your guts out; I'll kill him, damn him."   Witness couldn't tell who it was.   Never saw Mr. Falls as he went back to the house.   Witness was going home from Gastonia. Before witness got to the gin house he heard cursing for 2 or 3 minutes.   Stopped at the store and got mail.   Cross-examination:   Something like 50 yards before witness got to gin house.   He heard quarreling.   Witness thought one of them was Parish; heard cursing and thought two different men were doing it; witness' wagon was 25 or 30 yards from the gin when the man ran by the wagon.   It was about 5 minutes from the time cursing stopped till the negro came by, but didn't know at the time who it was that passed wagon.

Dr. Sloan:   Saw Tom Falls after he was cut, one-half or three quarters of an hour after he was cut.   He was cut in the left side in the bowels, 3 inches below the naval.   Witness examined the wound.   He had a stab wound of the large bowels—the descending; had gone through both sides of the bowels; it had not touched the back wall; deceased was fleshy.

The blade was in my opinion between 3 and 4 inches in length —possibly not so large. Deceased died on Sunday following. He died of peritonitis caused by that wound. The wound was a mortal stab. Cross-examined: The wound could have been made by a smaller or larger knife. Deceased's abdomen was pretty thick—a good deal of fat.

J. L. Falls: Was present when defendant was arrested in Rutherford County. It was the following Tuesday after deceased was cut on Thursday before. Defendant was in a negro's house; he was in a dwelling house; defendant ran out the back door and pulled the door after him. Mr. Jones shot twice after him. After he got around the garden fence he came by witness. Followed him over half a mile before they caught him. Knife shown witness and he says it looks like knife defendant had. Defendant said that the knife they had was the knife with which he stabbed Mr. Falls. Defendant said he opened the knife in his pocket after Falls put his hand on him. Mr. Jones kept the knife. Took that and what money he had. The knife shown witness has a blade three and one-half inches long.

It will be seen that not a particle of the evidence tended in the least, to show that the prisoner had any feeling of malice or even of unkindness toward the deceased until the fatal stab was inflicted. The prisoner had been in a quarrel it is true, with another man—Mr. Parish—an employee of the deceased, but the deceased had taken no part in it; and surely that is not evidence of malice against the deceased on the part of the prisoner. When the deceased came upon the scene the prisoner stepped from the platform into the wagon and from the wagon to the ground. In a short time—a few moments—the deceased walked down the steps of the platform and around the wagon and about ten or twelve feet off saw the prisoner standing near a tree. He approached him

in the darkness with Grissom and another employee close upon his heels—two feet behind. The deceased laid his hand on the shoulder of the prisoner and said "Are you the fellow has been fussing around here with Frank?" and further "what is all this fuss about? Come round to the light and tell me what you are fussing about." The deceased laid his hand on the prisoner just as he told him to come round to the light. I know that the witness Grissom said the manner of the deceased was kind; but it is plain from the surrounding circumstances that his manner was commanding. The deceased knew the prisoner; he had been told about the quarrel between Parish and the prisoner, and his language at the time of coming up with the prisoner meant nothing unless it meant a reproach and contempt for him and the determination to compel a submission of the quarrel to his judgment if not more. The conduct of the deceased was in law an assault upon the prisoner. According to the rules which govern human life in our stage of civilization nothing is, or can be, more offensive to the average person than having the hands of another person laid upon him and being told at the same time to do or not to do a particular thing. And the law is of universal application and makes no distinction between persons. It is simply idle to attempt to draw any analogy between this case and the case where one person should walk up to another, without a word of warning or threat, and kill that other in a public street or place. In that case the inference would be irresistible that the purpose to kill had been formed before the assailant had met his victim. Here the prisoner was looked for by the deceased and the assault made upon the prisoner.

It is clear then that there was no malice by the prisoner toward the deceased at any time except that which arose in law from the killing, and that there was no premeditation

to kill and that the purpose to kill arose simultaneously with the assault made upon the prisoner.

We have now to examine the conduct of the prisoner after the killing. It is enough to remark on the question of the flight of the prisoner that such a course might be evidence of the prisoner's guilt of crime, but it was no evidence of the *degree* of the crime he had committed. If the language of the prisoner as he ran off had been used before he stabbed the deceased it would of course have been evidence both of malice and of premeditation; but used afterwards it tended to show nothing except that either he did not think he had killed the deceased or that he intended to do so in the future. The evidence concerning the time when the prisoner opened the knife is conflicting. Grissom said "Defendant did not open the knife after Falls got there; he did not put his hands in his pocket." According to the evidence of one of the witnesses the prisoner said when he was arrested that he opened the knife in his pocket after Falls put his hand on him. If the prisoner had his knife open in his hands before the deceased came up with him standing under the tree it can not be contended that he had opened it for the purpose of stabbing the deceased for the reasons already given; and if he opened the knife as he said he did, after the deceased laid his hands on him, then the opening of the knife and the stabbing of the defendant was simultaneous with the assault on the prisoner and in neither view was there evidence going to show that the prisoner stabbed the deceased with premeditation and deliberation.

. The case of *State v. Dowden,* 118 N. C., 1145, has been referred to as a case very much resembling this. If that case resembles this in any respect it is very clearly distinguishable. There were method and artifice on the part of the prisoner in that case; there was a motive—anger—because he was

required to get off the engine; the time was selected by the prisoner to shoot the deceased—when his back was turned. All such circumstances are lacking in this case. For the reasons set out in this opinion I think there was no evidence going to show that the prisoner was guilty of murder in the first degree, and I must concur in the opinion of the Court.

DOUGLAS, J., concurring. I am unwilling to rest under the charge that the increase of lynchings is caused by the inability of the Courts to protect society from murderers. In the first place I do not think there has been any increase of lynching in this State, where it has always been extremely rare; and even if our Courts were inefficient, which I emphatically deny, I do not see how our alleged laxity should increase lynchings in other States without having any effect in our own. Such suggestions do great injustice to our State and may do great harm by encouraging the very outrages they profess to denounce. In any event they tend to weaken, especially when coming from such a source, the respect of the people for the administration of justice, which is the foundation of social order. I feel safe in saying that the Courts of this State are fully competent to protect our citizens, and able to do so without denying to anyone the equal protection of the law. The temple of justice contains no altar of sacrifice, nor do the people of North Carolina demand a scapegoat for the sins of the ten thousand murderers throughout the country.

We are told that wealthy men who have money enough to retain able counsel are rarely convicted of murder. Are they ever lynched? If they are never lynched, then lynch law can in no sense be regarded as a protest against their acquittal.

It is always a matter of regret that a Judge should ever feel it his duty to go outside the record in defending the

opinion of the Court; but when his action is questioned in a manner that he can not ignore, his silence may be construed into an apparent acquiescence that may tend to bring into disrepute the tribunals of justice and the laws of the land.

Feeling as I do, more I do not wish to say, less I could not say. I concur in the opinion of the Court.