IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA 1865.

## Hopkins *versus* The Commonwealth.

| 50 | 9 |
| 28 SC ¹194 | |

*Appellate jurisdiction of Supreme Court in capital cases.—General threats, when evidence of malice on trial for murder.—Record of finding of grand jury, when sufficient.*

1. The Supreme Court have no power in capital cases to review points which were not taken in the court below nor filed of record, but are confined to exceptions taken on the trial to some question of law or evidence, or to the opinion of the court below upon a written point, which, together with the decision, must be filed of record as in civil cases.

2. Threats made by a prisoner within an hour before the commission of the murder, that "he would kill somebody before twenty-four hours," are evidence of malice prepense, though they did not expressly refer to the deceased, and if he killed anybody in pursuance of such malice, it was murder in the first degree.

3. The short entry on the docket of "true bill," is a sufficient record of the finding of the grand jury.

ERROR to the Oyer and Terminer of *Philadelphia*.

At December Sessions 1864, William Hopkins was indicted for the murder of Andrew McMarity.

The main facts of the case were these:—On Sunday, the 15th of January 1864, the prisoner and deceased were both on board the United States supply-steamer Bermuda. The ship was crowded with sailors and marines, and among the latter was Andrew McMarity, a passenger. Hopkins threw a cup of coffee at a negro,

missed him, and, in so doing, struck Mount, a marine.  A contest ensued between a number of parties standing on the starboard side of the vessel.  These were speedily joined by others, who passed from the starboard to the port side of the ship, and the prisoner fell over a mess-chest, where, after struggling, he recovered himself, and shortly after Andrew McMarity received a wound in the neck, from the effects of which he died.

On the trial the district attorney offered to prove by a witness (Galbraith), that *fifteen minutes* before the killing of Andrew McMarity, the prisoner threatened he would kill somebody on board of the vessel before twenty-four hours, and that he, the defendant, was at that time malignant in his conduct and character.  Upon this statement the district attorney asked the witness the following questions :

Q. " At that time will you state what threats he made, and what he said shortly before the occurrence ?"

To this question and to the evidence, Mr. Owens, counsel for the prisoner, objected for the following reasons : because the said threats were general and vague, and did not refer to the deceased ; and were not *res gesta*, or pertinent to the issue.

This objection was overruled by the court, and the offer and evidence admitted.

Under the ruling of the court (LUDLOW, J.), the jury found the defendant guilty of murder in the first degree.

This writ was then sued out by the defendant, and the admission of the testimony above mentioned, and the fact that " it did not appear that the finding of the grand jury was ever recorded by the clerk, and that the record did not show that the grand jury had returned the record into court," were assigned for error.

*David Paul Brown* and *John A. Owens*, for plaintiff in error, argued, as to the first point, that the language of the offer of the district attorney, which is fairly involved in this discussion, was entirely irregular and illegal ; leading and instructive to the witness, and calculated, through the very second witness examined by him, to affect the prisoner, by proving that he (the prisoner) was malignant in his conduct and character at that time ; that the answer made by the witness did not support the time, fifteen minutes, fixed by the district attorney, but denied any threats *at that time*, saying, I heard the prisoner make no threats against McMarity, and fixes the threats an hour before the fight, without stating what was their cause, or to whom they referred.  The evidence separately and in its connection with the offer was illegal, and was calculated to prejudice the rights of the prisoner.

That the rule to be applied to this question is, that distinct crimes from that laid in the indictment, as a general principle, cannot be proved against a prisoner, as the ground of a pre-

sumption of his having committed the offence of which he stands charged. In other words, that the evidence of such other offences must be connected not only *in point of time*, but *in motive*, with the individual injured: 1 Wh. C. L. § 824.

It is not allowable to show upon the trial of an indictment that the prisoner has a general disposition to commit the same kind of an offence as that for which he stands indicted: Phil. Ev.; State v. Kenton, 15 N. H. 169; Regina v. Oddy, 4 Eng. L. & Eq. 572. Yet this is exactly the tendency of the evidence of Galbraith, to which we excepted. Its whole scope and purport was to show a tendency or disposition on the part of the accused to commit the same kind of an offence as that for which he stood indicted. See State v. Barfield, 7 Iredell 299.

The prosecution had no right to introduce general character or general conduct (which are convertible terms in the law, Zeiler v. Muckle, 12 Harris 408) at an antecedent time, for the purpose of affecting the rights of the prisoner, and adding probabilities or liabilities to the charge.

The question was put at the very introduction of the cause, and before the defendant had examined a single witness. It was not to rebut any proof of the prisoner's, with regard to character—and even if it had been it would be perfectly inadmissible, both in regard to form and substance—it was a leading question, and it appealed to the witness's individual opinion as to the prisoner's character. It was addressed to the prejudices and not to the judgment of the jury, and no doubt contributed largely to produce that verdict of which we now complain.

It is not enough to say that the reception of this evidence, which has been wrongfully admitted, could have made no difference; you should have taken care not to put in bad evidence. "The alleged unimportance of a piece of evidence improperly rejected or admitted is no ground for refusing to send a case down for a new trial:" Baron De Bulger v. Farr, 5 N. & M. 618.

In this case the improper admission of this testimony, elicited by the equally objectionable form of an offer and interrogations which suggested the reply while asking the information, cannot fail to have operated against the prisoner in the estimation of the jury. The vapouring of a drunken man was mistaken for malice; an isolated passage from his incoherent raving during the frenzy of intoxication, for *premeditation*. For there was no other fact or fancy that could lead even the most credulous mind to a suspicion of deliberation. All the previous evidence negatived the assertion of such a thing. The homicide was committed in the excitement and turmoil of an affray.

II. The second specification of error stands upon a technical basis, but still has its weight, arising as it does in the case of a man who certainly was not rightfully convicted of murder in the

first degree upon the evidence adduced against him. The finding of the grand jury should be recorded by the clerk, and an omission in that respect cannot be supplied by an endorsement of the foreman, nor by the recital in 'the record that the defendant stands indicted, nor by his arraignment, nor by his plea of not guilty. It cannot be intended he was indicted. The recording of the finding of the grand jury is as essential as the recording of the finding of the petit jury: 1 Wh. C. L. 501; Commonwealth *v.* Cawood, 2 Vir. Cas. 527; State *v.* Glover, 3 Iowa 249. So that this error also, while perhaps not bearing as directly on the merits as that contained in our first specification of error, is also a reason why this writ of error should be sustained.

*William B. Mann*, District Attorney, for the Commonwealth.

The opinion of the court was delivered by

WOODWARD, C. J.—The argument in this case was not limited to the single exception to evidence which appears upon the record, but extended itself to the construction of the Act of 1794, in respect to the distinction between murder in the first, and murder in the second degree. The court below has very properly sent up all the evidence, in order that we might the better judge of the admissibility of the one piece excepted to, and counsel improved the opportunity to argue at large that upon the whole evidence the prisoner ought, at most, to have been convicted only of murder in the second degree, although the record exhibited no prayer for a direction to that effect, and no exceptions to such instructions as were given.

Upon such a presentation of the case it becomes necessary that we define with precision our appellate jurisdiction in capital cases, lest on the one hand we withhold from the accused what may seem to be his rights in this court, or on the other hand we be betrayed into the decision of a very grave question of law, which, in no proper sense and legal form, has been submitted to us.

By both the Acts of Assembly of 22d April 1722, and 16th June 1836, Purd. 928, appellate jurisdiction was conferred upon this court to hear and determine all manner of pleas, plaints, and causes, which should be removed or brought here from the inferior courts, and to examine and correct all manner of errors of the justices and magistrates in their judgments, processes, and proceedings, as well in criminal as in civil pleas or proceedings, and according to the old Act of 1722 to affirm or reverse; but according to the Act of 1836 to affirm, reverse, *or modify* the judgments, decrees, or proceedings thus brought up. This power to modify final decrees and judgments is constantly exercised in civil cases, and was exercised in a criminal case in Commonwealth *v.* Daniels, 7 Barr 375.

[Hopkins v. The Commonwealth.]

The " plaints, pleas, causes, proceedings, judgments, and decrees," mentioned in the Acts of Assembly, are the ordinary proceedings of what are technically called courts of record, and the writ of error, which is the common law instrument of removing the record of one court into a court of higher jurisdiction, lies only upon matters of law arising upon the face of the proceedings. Hence, therefore, the appellate jurisdiction conferred by the above-named Acts of Assembly was limited necessarily to the correction of errors *appearing of record*. By the forms of the common law the incidents of the trial do not appear in the memorandum, which in England is sometimes called the "*postea*," and sometimes the "*nisi prius*" roll, and with us, the court minutes or docket entries. Neither the testimony of witnesses, nor the opinion of the court upon questions of evidence, nor the charge of the court ever appeared on these court minutes or docket entries, and therefore never were, at common law, and, but for statutes, never would have been removable by writ of error.

But the Statute of Westminster 2d, 13 Edward I., c. 31, was extended to Pennsylvania, and it gave us bills of exception. " When one that is impleaded before any of the justices doth allege an exception, praying that the justices will allow it, which, if they will not allow, if he that alleged the exception do write the same exception, and require that the justices will put to their seals for a witness the justices shall so do, and if one will not another of the company shall."

Here was the legislative authority to add to the component parts of a judicial record, as it is defined by the common law, those incidents of the trial in which damaging errors might lurk, but for which the injured party had no redress at common law, except by appeal to the second thought of the same court in which the error occurred. But the Statute of Westminster 2d was held not to extend to criminal cases, at least such appears to be the better opinion in England. See the cases cited in 2 Bacon's Abridg., tit. *Bill of Exceptions*. And such was certainly the opinion of this court in Middleton's Case, 2 Watts 286, and in Sampson's Case, 5 W. & S. 387.

In criminal cases, therefore, our appellate jurisdiction stood as at the common law until the Act of 6th November 1856, amended and supplied by the Act of 31st March 1860, Purd. 260, which gave defendants, upon the trial of any indictment for murder or voluntary manslaughter, the right to except to any decision of the court upon any point of evidence or law, which exception shall be noted by the court, and filed of record as in civil cases. And if the court shall be required by the defendant to give an opinion upon any point submitted and stated in writing, the court is required to answer the same fully, and file the point and answer of record. A writ of error may then be allowed, if specially

applied for within thirty days, to the court in banc, if in session, and to a judge at chambers if in vacation.

In this manner our appellate jurisdiction in capital cases has been extended and regulated. We had jurisdiction of the *records* in such cases from 1722, but we had no power to review what was not any part of the record until this Act of Assembly of 1860, and it is a plain and necessary inference that our powers under the Act of 1860 are limited to the conditions prescribed by the legislature.

The trial must be for murder or voluntary manslaughter. We would have no power by virtue of this statute to award a writ of error in any other criminal case. There must be an exception to a decision of the court upon some point of evidence or law, or to an opinion of the court upon a written point, and the decision and the point must be filed of record as in civil cases. Have we power to review points first made in this court, and not taken in the court below nor filed of record? Clearly not; no more than we would have power to apply the statute to other crimes than those mentioned; no more than we would have had power to notice any bill of exceptions in a criminal case before the statute.

We are not at all inclined to a hypercritical construction of an Act of Assembly which, though of questionable expediency, and never acceptable to some of the best thinkers in the legal profession, was evidently intended to be another security of human life; but accepting the enactment according to its plain letter, and giving it the full scope the legislature meant it should have, we cannot doubt that our powers, though enlarged by it, are limited to the correction of such errors in the specified cases as are patent upon the face of the record, or which have been superadded to the record in the manner prescribed by the statute.

As there was no prayer for instruction in regard to the Act of 1794, on the trial of this cause, no point submitted, either orally or in writing, touching the degrees of murder, and no exception to anything delivered by the learned judge on the subject, is it not manifest, beyond all controversy, that to obtrude our discussion of the point suggested in argument would be an impertinent interference with the established course of administering criminal law? Nor is there any necessity for us to repeat our views of the statute of 1794, in a case that does not call for them, for they have been frequently expressed, and especially in a very satisfactory manner by my brother Thompson, in Kelly's Case, 1 Grant 491. This is enough to say of the main ground assumed in argument.

It is time now to attend to the questions that *are* up for review. After the Commonwealth had given evidence of the principal circumstances of the killing, they proposed to prove by John

[Hopkins *v*. The Commonwealth.]

Galbraith, the witness on the stand, what threats the prisoner made, and what he said shortly before the occurrence.

I state the question as it stands in the bill of exception, for if there was error it consisted in allowing that particular question to be answered. In the argument, the court's note of the offer made by the district attorney was discussed as if the error was in that, but the court may have loosely noted the verbal offer of the district attorney, or he may have loosely described it, and it is not very important whether an offer in just those words were admissible or not, because the colloquy between the court and the counsel was not the evidence admitted, and did not enter into the question addressed to the witness. The error, if any, was in receiving the answer to the precise question which was addressed to the witness, and our question is, Was there error in that?

To get at the state of the prisoner's mind, and to show that he harboured revengeful and murderous passions, it was competent to prove his threats at or about the time of dealing the deadly blow. It was part of the *res gestæ*. "Upon an inquiry," says Mr. Greenleaf, vol. 1, § 108, " as to the state of mind, sentiments, or disposition of a person at any particular period, his declarations and conversations are admissible. They are parts of the *res gestæ*."

A drunken broil between marines and sailors prevailed on shipboard. The prisoner's conduct had been so violent that he had been in irons several hours the day of the killing, and when released his turbulent and quarrelsome conduct was resumed. Less than an hour before the mortal stab was given to McMarity, the prisoner declared he would kill somebody before twenty-four hours; he hallooed it all around the deck, says a witness. Now it was of material consequence that the Commonwealth, who sought to convict the prisoner of murder in the first degree, should give evidence of a premeditated purpose, a formed design to kill or to do some great bodily harm; for without malice prepense there could be no conviction of the higher grade of murder.

Nor was it necessary that the premeditated malice should have selected its victim. If the jury believed that the prisoner had formed the deliberate design to kill somebody, and in pursuance of that purpose, within an hour after declaring it, did kill McMarity, the Commonwealth had a right to insist upon his conviction of murder in the first degree, and that they might thus insist, they had a right to prove his declaration an hour before the deed. Blackstone ranks "antecedent menaces," and "former grudges" as evidences, of malice prepense; and he tells us, moreover, that malice prepense is not so properly spite or malevolence to the deceased, in particular as any evil design in general, the dictate of a wicked, depraved, and malignant heart. The witness said he heard no threats against McMarity, but this made his testimony

[Hopkins *v.* The Commonwealth.]

none the less admissible, for a killing anybody in pursuance of the malicious purpose which the general threat evidenced was murder. We conclude, therefore, that there was no error in admitting the evidence contained in the only bill that was sealed.

Another error is assigned, not arising out of a bill of exception, but as a defect in the record, to the effect that it does not appear that the finding of the grand jury was returned into court or recorded.

There are respectable authorities to the point, that the finding of the grand jury should be recorded, and that an omission in this respect cannot be supplied by an endorsement of the foreman, nor by the recital in the record that the defendant stands indicted, nor by his arraignment and plea of not guilty. The recording of the finding of a grand jury is said to be as essential as the recording of the verdict of the petit jury: Wharton's Criminal Law, 3d ed. p. 237, and the cases cited in notes.

In our practice the grand jury return their bills to the court, whose clerk notes on the court's minutes the title of each bill, and the finding, "ignoramus," or "true bill," as the case may be. This is the recording of the finding. The body of the indictment is never recorded, and however well it might be in some instances to have a record copy to supply what sometimes happens, a loss of the bill from the files, or to detect an interlineation or other tampering with the bill, yet there is no rule of practice that demands it, and the want of it, even in a capital case, is no ground of error. The record in this case was made up in substantial conformity to the general practice. Under date of January 26th 1865, the title of the bill was noted upon the court minutes, together with the number and term and the crime charged, and then followed "true bill," which we understand to have been the return of the grand jury of that indictment, and this was the recording of the return, so that there is no more ground for this assignment of error than every criminal record in the Commonwealth might present.

None of the errors assigned having been sustained,

The judgment must be affirmed.