STATE v. COLE.

(Filed May 19, 1903.)

1. INDICTMENT—*Sufficiency of Indictment—Homicide — Premeditation and Deliberation—Murder in First Degree—Murder in Second Degree—Manslaughter—Acts 1893, Ch. 85—Constitution, Art. 1, Sec. 11.*

   An indictment for murder need not contain the words "premeditation" and "deliberation."

2. EVIDENCE—*Sufficiency of Evidence—Homicide — Murder in First Degree.*

   The evidence in this case is not sufficient to be submitted to the jury as to the guilt of the accused of murder in the first degree.

   CLARK, C. J., dissenting.

INDICTMENT against Joe Cole and others, heard by Judge *Francis D. Winston* and a jury, at Fall Term, 1902, of the Superior Court of VANCE County. From a verdict of guilty of murder in the first degree against Joe Cole, and judgment thereon, he appealed.

The prisoner was indicted for murder, as follows: The jurors, etc., present that Joe Cole, Joe Cole, Jr., and John Jones, late of the County of Vance, on the 29th day of September, 1902, with force and arms, at and in the county aforesaid, feloniously, wilfully and of their malice aforethought, did kill and murder Fred. Stevens, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State.

The jury found Joe Cole guilty of murder in the first degree, and Joe Cole, Jr., and John Jones guilty of murder in the second degree. Sentence of death was pronounced upon Joe Cole, and he appealed.

The evidence was as follows. W. P. Clement testified for the State that he was on the train leaving Manson: "I got on the rear of the second-class car for white people, and went through and found the darkeys singing boisterous songs, and

I said 'boys you are in the wrong car, you will have to go to your car.' There were six or seven, including the two Coles and Jones. They paid no attention. I tapped little Joe on the shoulder and repeated what I had said. He replied: 'By God, we will go when we get ready.' I then went out, opening the door of the white car, and opposite the door of the colored car, telling them to come on. I went to the front end of the colored car and started back, taking up tickets. The car had three compartments—first-class, second-class and smoker. The last was next to second-class car for whites. When I reached the first-class compartment I met all the crowd coming back, muttering: 'We have first-class tickets and how is it we are driven round this way.' All passed through the second-class car except four, old Joe, little Joe, Jones and another. I started to pass when little Joe, Jones and the other, whose name I do not know, caught hold of me and said: 'How is this, we've got first-class tickets and we are driven round this way; how is it?' I explained that it was a State law and the railroad had nothing to do with it. Old Joe (the appellant) just then entered the first-class compartment from the smoker. He came on saying something, I don't know what, a sort of roaring. The first I caught was: 'We are all friends, we are all brothers, we'll all fight for one another, and we'll all die for one another.' While he was saying that, Mitchell, my porter, was standing by patting him on the shoulder, and said 'let Captain explain.' Old Joe lunged at me to hit me with his fist. The porter then hit him in the chest with his hand and prevented his hitting me. He staggered back against the smoking room door and drew his pistol. The porter then rushed on him and pushed him back into the front left hand corner of the smoking room. At that time, little Joe, Jones and the other one, shoved me in the smoking room with them. I straightened up and saw old Joe Cole shove the porter off with his left hand and raise his right

hand.  He did that twice.  There was a pistol in his right hand.  Then little Joe tackled the porter with a pistol in his hand.  The porter turned and left old Joe free.  Then Stevens entered the back door of the car and ran up to old Joe to grab him, his head to one side and his eyes shut.  He touched old Joe with his hand, but did not flinch him.  Just as he was about to hit old Joe and before he struck him, Cole raised his pistol, put it at Stevens' face and shot him.  Young Joe then shot the porter.  I think he shot the porter first.  He hallooed, 'I am shot.'  Jones got his pistol out, but did not use it.  He helped push me in the smoking car.  From the time I left them in the white car until I met them in the colored car, was not less than two, nor more than four minutes.  This occurred in North Carolina about one and a quarter miles north of Middleburg, in Vance County, on the 17th August, 1902, at 2:15 p. m.  Stevens was roadmaster and my superior.  Jones had a pistol, didn't try to do a thing that I saw or heard.  It was on the Raleigh & Gaston Railroad.  Stevens was not roadmaster of that part of the road where this occurred, and had no jurisdiction over me there.  Stevens was a stout man (as large as Mr. B., one of the counsel), he rushed on Joe with head turned to one side, with his eyes shut.  Then this man pushed his pistol in his face and fired.  Stevens came from the white car.  He had not talked with either of these persons that I know of.  The prisoners were from Lynchburg, Va., and got on my train at Norlina.  They acted like they had been drinking, and I thought they had.  Jim Mitchell is in the Rex Hospital in Raleigh."

Sam Newsome testified for the State:  "These men got on at Norlina.  At Ridgeway they became offensive in the second-class colored car.  Just before we got to Manson, they passed through the first-class colored car and went to the white car singing.  After we got to Manson, Captain Clement came through my car, first-class colored, taking up tickets.

Joe Cole met the captain in first-class car and said 'you turned my son and the rest out of the car and we've got first-class tickets.' He put his hand behind him, and a colored woman said 'he is going to shoot.' He drew his fists, then the porter came up and took him by the arm and talked to him, saying 'conductor will explain,' and got him back in the smoker. Two others passed behind the conductor and got in the smoker. I went to the smoker door. Young man Cole told the porter to turn his father loose, took out his pistol and shot the porter, who refused to do so. About that time, the roadmaster (Stevens) came in from the second-class white car and went to take old man Cole, who shot him with a pistol. Old Joe was standing up when he shot, and nobody had hold of him. Captain Clement was on the right hand side of the smoker when the porter was shot. I saw nothing done to the prisoners. I would have seen it in that car. Clement and the porter had no pistols. I saw the old man and the young man have pistols. The old man here is the man. I recognize him. Stevens was killed, was dead when he hit the floor, shot in the head. There were other passengers on the train in the second-class car, and some in the car we were in."

Isaac Steinheimer testified for the State: "I was on train in first-class coach for whites, heard of the shooting and went forward. At rear end of the colored coach I found Turner holding the two Coles, who were trying to escape. They were on bottom step of the platform. Gun was called for. I got one and assisted in securing and tieing them. I took pistol from old Cole's pocket. It had been recently fired. No pistol was found on young Cole or Jones. I didn't see the trouble at all and knew nothing of it until it had ended. I got the pistol and cartridges of the old man.

J. B. Brack testified for the State to finding a pistol near a point where he understood the train had stopped after the

shooting, between Rowland's and Twisdale's places. It was the day after the shooting, about one o'clock p. m.

Captain Clement recalled: "The train stopped after the shooting between Rowland's and Twisdale's places, about a mile and a half north of Middleburg. From Manson to Middleburg, four or five miles. Schedule time between these stations six minutes. The second-class car for whites was nearly full of passengers. I knew a good many of them and can name several now" (which he did). The prisoner was convicted of murder in the first degree and moved in arrest of judgment. The motion was overruled and the prisoner appealed from the judgment pronounced.

*Robert D. Gilmer, Attorney-General,* and *J. H. Bridgers,* for the State.

*T. M. Pittman,* for the defendant.

CONNOR, J. The first question raised on the appeal for the consideration of the court is, whether the bill of indictment is sufficient in substance and form to support the finding by the jury of murder in the first degree.

The indictment is in the form generally used in this State, and did not charge that the killing was done with premeditation and deliberation. The contention of the prisoner's counsel is that Section 3, Chapter 85, of the Laws of 1893 conflicts with Section 11 of Article 1 of the State Constitution, and that therefore the statutory provision must be declared void. It is ordained in that Article of the Constitution that "in all criminal prosecutions, every man has the right to be informed of the accusation against him" . . . . The Act of 1893, Chapter 85, does not deny to the accused that right. Murder was the charge made against the prisoner. He knew (by fiction of law at least) that prior to the Act of 1893 it was not necessary either to aver or prove deliberation and premeditation as to the killing. It was sufficient if

malice was shown. The Act of 1893 was to that extent favorable to those who, after its enactment, might be indicted for murder. But such as might be, after that time, indicted for murder were informed by Section 3 of the Act (notwithstanding the advantage given to those charged with murder) that the form of the indictment in use in the State would not be altered, and that the jury upon the evidence should determine in their verdict whether the crime was murder in the first or second degree, premeditation and deliberation being the features which constitute murder in the first degree. The very words of the Act give a clear notice of the form of indictment to be used, and what could be shown in evidence by the State, and the duty and power of the jury to inquire into and weigh the evidence and to determine whether the homicide was committed with premeditation and deliberation. Our statute, then, does not not change the quality of the crime of murder, as the offense was defined before the enactment of the statute. The division simply notices, concedes, that the atrociousness of the crime may be greater or less according to conditions and surroundings, and the punishment to be inflicted should be greater in some instances than in others. Many of the States of the Union have statutes similar to ours, and a majority of the courts sustain the sufficiency of bills of indictment that do not contain the averment of premeditation and deliberation.

The question has not been directly raised in this court, but in a number of cases that have been before us, since the Act of 1893, our attention has been called to the form of the indictment, and none of the judges, so far as this writer knows, has had doubts about the sufficiency of such indictment. The point was virtually decided in *State v. Covinglon,* 117 N. C., 866. We think the ruling of his Honor in refusing to have the judgment arrested for insufficiency of the indictment was correct.

Whatever difference of opinion may have existed in regard to the construction of the Act of 1893, Chapter 85, before or at the time of the decision of Fuller's case, it is now conceded that by the statute the crime of murder in the second degree is as at common law, which is defined to be: "When a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the King's peace, with malice aforethought either express or implied." Blk. Com., star p. 195. To constitute murder in the first degree, since the passage of the statute, the same elements are requisite with the additional and essential one of "premeditation and deliberation." That from the use of a deadly weapon, either proved or admitted, the law implies malice and the burden is upon the prisoner to show, if he can, matter in excuse, justification or mitigation. It is the duty, and incumbent upon the State, if it will ask for a conviction of murder in the first degree, to prove "premeditation and deliberation." They will not be presumed or implied from the use of a deadly weapon. *State v. Fuller,* 114 N. C., 885; *State v. Rhyne,* 124 N. C., 847.

The present Chief Justice, who dissented in Fuller's case and Rhyne's case, said in his dissenting opinion in the last named case, in speaking of the construction placed on the Act in Fuller's case, "having reiterated it since, we must take it now as settled." These decisions, however, also hold that no particular length of time is necessary to constitute premeditation, 124 N. C., 857. The court will not undertake to prescribe any arbitrary rule defining the time during which it is necessary that the prisoner "premeditate and deliberate." In the several cases which have come before this court upon appeal, it has adhered to this construction of the statute, the division of opinion among its members being in regard to the question whether there was or was not evidence of "premeditation and deliberation."

We assume that it is also well settled that if one, attempting to commit a premeditated and deliberate murder, shall, while in the act, and as a result of it, kill another, he will in respect to the person killed, be guilty of murder in the first degree; as if one lay poison for A and it is taken by B from which he dies, it is murder in the first degree; or if one, of malice either express or implied but without premeditation, be in the act of killing A and while in the act and as a result thereof he kill B, it is murder in the second degree.    In both these cases however, there must be a legal connection or relation between the original purpose and act and the unexpected result.    In a certain sense of course, every act is related to every other and preceding act of a human being, but the law being based upon principles applicable to the practical transactions of human life avoids impracticable scholastic refinements and adopts such rules as experience has shown to be capable of practical application."

His Honor charged the jury: "If the killing of Stevens was not the result of an effort to kill Clements, but was intentionally done, then the prisoner could not be convicted of murder in the first degre for such killing unless the jury find beyond a reasonable doubt, that the prisoner, before the shooting, coolly determined to kill Stevens, and had deliberatd and premeditated on it, and as a result had formed a fixed purpose to kill; in other words, to convict a prisoner of murder in the first degree, you must be satisfied beyond a reasonable doubt either that the prisoner had with deliberation and premeditation formed a fixed purpose in his mind, before he shot, to shoot and kill Clements, and, in an effort to do so, killed Stevens, or he had with deliberation and premeditation formed a fixed purpose to kill Stevens and in pursuance of such fixed, determined, premeditated and deliberate purpose he did kill Stevens; in either of these situations, he would be guilty of murder in the first degree."

We are not inadvertent to the difficulty which is always involved in the question whether testimony is of sufficient probative force to constitute evidence, or whether it is a mere scintilla. The rule is clear that testimony must be sufficient to do more than raise a mere conjecture or suspicion. The difficulty is found in applying it to particular cases as they arise. Certainly this court will not interfere with the conclusion of a judge and a jury that there was not only some, but sufficient evidence to bring the mind to a conclusion of guilt beyond a reasonable doubt, except in a very clear case of error. In this case, with the full statement of the uncontradicted testimony of an eye witness, which is consistent and bears the impress of truth, we are forced to the conclusion that there was not sufficient evidence that the prisoner killed the deceased "in an effort to kill Clements, or that he had with deliberation and premeditation formed a fixed purpose to kill Stevens."

We do not pass upon or express an opinion in regard to his purpose to kill Clements, but assuming for the sake of the argument that he had done so, he did not have his pistol pointed towards him, but, as Stevens came in, "he raised his pistol." The position of Clements at the moment that Stevens came in the car rendered it impossible for the prisoner to shoot at him and hit Stevens. Clements says expressly that, as Stevens came in, the prisoner raised his pistol and shot. The coming in of Stevens, who was doubtless attracted by what had occurred and the noise, was a separate and independent incident in the transaction; it bore no legal relation to the then condition of the parties; it was the intervention of a new element or agency, and brought about an unexpected and, in a legal sense, independent result. The shooting of Stevens by the prisoner was without necessity. He was not armed; his evident purpose was to interfere and aid the conductor and porter in compelling the prisoner and

those with him to behave themselves; he was free from blame. The prisoner, by his prayer for instructions prepared by faithful, able and learned counsel, concedes that he is guilty of murder in the second degree, which excludes all idea of excuse.

While we adhere to the decisions of this court that it is not necessary that any "particular time" shall elapse for the prisoner to meditate and deliberate, yet the very term necessarily involves the idea that there must be sometime, however short, between the first conscious conception and the completion of a purpose or determination in his mind. Fitz James Stephens, in his "History of the Criminal Law of England," gives an interesting account of the efforts made by the sages of the law to work out a satisfactory definition of "malice", "malice aforethought", and "malice prepense". The author suggests that he has solved the difficulty in his "Digest". The conclusion to which we are brought is that it affords another of the many illustrations of the poverty of language in giving expression to mental conceptions. We find that the words "foresight", "forethought", "forecast" and "premeditation" are used as synonyms. "A man shows his want of premeditation who acts or speaks on the impulse of the moment."

It is impossible to conceive of an act committed under the conditions described by Clements, in the killing of the deceased, as being the result of "premeditation and deliberation", or the expression of a "fixed purpose". Of course, it is for the jury by their verdict to fix the degree, but it is not contemplated that they shall do so arbitrarily or in accordance with their opinion as to the kind or quantum of punishment which should be inflicted. Their verdict must be based upon competent evidence under a fixed rule of law. In some States of the Union, the question of punishment is left with the jury. Such has never been the purpose or the policy of the legislature of this State.

We should, in accordance with the example set by those who have preceded us, have been content to conclude this opinion with the declaration of the law of the case and our reasons therefor, but for the suggestion urged upon us that, in some way, we are giving encouragement to lawlessness and "lynching". The very remarkable suggestion is made and seriously insisted upon, that it is our duty in the decision of this case to consult criminal statistics, newspaper reports of lynchings and threats thereof, that we may be the better enabled to know and declare what the law is by doing so. Just how, or by what mental process, this court is to be enlightened in this way, we are not very clearly advised. Nor can we conjecture what certain persons or classes of persons may say or do, because we have, in the discharge of our duty, adjudged the prisoner to be entitled to a new trial. "Such an argument should not be addressed to courts, which cannot make but only construe and administer the law as it is written. If worthy of consideration, it should be directed to the legislature as a reason for changing the law." This is the language of a great and learned judge (Bynum, J., in *Bank v. Greene,* 78 N. C., 247.) To the suggestion that the construction put upon the statute in Fuller's case decided in 1894 is "unfortunate", we note that the personnel of this court has since that time undergone many changes, and the case has at almost every term been cited with approval, and conceded to be the controlling authority for this court. It is also worthy of note that the legislature has met at five different sessions and the law in this respect has not been changed. We have no other means of ascertaining what the law is. The conclusion which we have reached is sustained by the uniform current decisions of this court, and our best consideration, guided not by criminal statistics, frequently misleading, nor by an attempt to ascertain or direct public sentiment, but by a determination "to administer justice without respect to persons, and to do

equal rights to the poor and rich, to the State and to individuals." Whether such suggestions (which do not come from counsel) that the judges, either from incapacity to know the law, or mental bias or sentimental weakness, are inefficient or incompetent, are calculated to suppress lawlessness, is well worthy serious consideration. If we are to have "a government of law and not of men", the courts must be content to move in the orbit assigned to them by the Constitution, declaring the law as it is written, "knowing nothing of the parties, everything about the case." When we "go outside of the record" to decide causes, we invite counsel to address to us arguments fit for other forums than this, and ourselves embark into unknown and unsafe waters. The law, instead of being a fixed "rule of action" for the guidance of the citizen and protection of his life, liberty and property, becomes the expression of the opinion of men set in high judicial position, varying according to the drift of public sentiment or temporary conditions. This is not the example or teaching of the Elders. We will not do the people of this State the injustice to believe that they desire their judges to construe the law otherwise than it is written by themselves, or to hasten any man, however degraded or humble, to his death in accordance with arguments drawn from other sources than the "law of the land."

We think that the prisoner was entitled to have the jury instructed, as prayed by him, that there was no evidence of murder in the first degree, and that, for the refusal to give it, he is entitled to a

New Trial.

CLARK, C. J., (dissenting). There is no contradiction in the testimony upon which the exceptions made to the charge of his honor are based. Clements, the conductor in charge of the train, found, upon leaving Manson, several negroes in the

rear end of the second-class car for whites, singing boisterous songs. There were six or seven of them, including the prisoner. He said to them that they were in the wrong car— "You will have to go to your car." They paid no attention. He tapped "little Joe" on the shoulder and repeated the language. He said "By G—d! we will when we get ready." The conductor went out, opening the door of the white car, and opposite the door of the colored car, telling them to come on, and started back, taking up tickets. The car for colored people had three compartments—second-class, first-class, and smoker. The last was next to the second-class for whites. When he reached the first-class compartment he met all the crowd coming back, muttering, "We have first-class tickets and how is it, we are driven around this way?" All passed through the second-class compartment, except the prisoner, "little Joe Cole," and one other. As the conductor started to pass through, little Joe and one other, whose name he did not know, caught hold of him and said: "How is this? We have got first-class tickets, and are driven about in this way? How is it?" The conductor explained that it was a state law, and the railroad had nothing to do with it. The prisoner just then entered the first-class compartment from the smoker, and came on, saying something the conductor did not understand —a sort of roaring. The first thing he caught was: "We are all friends. We are all brothers. We will fight for one another. We will die for one another." While he was saying that, the porter was standing by, patting him on the shoulder, saying, "Let captain explain." The prisoner "lunged" at the conductor, and hit him with his fist. The porter then hit him in the chest with his hand, and prevented him from hitting the conductor. He staggered back against the smoker-car door and drew his pistol. The porter then rushed on the prisoner, and pushed him back into the front left-hand corner of the smoking room. At this time, little

Joe and Jones and another shoved the conductor into the smoking room with them. The conductor straightened up, and saw the prisoner shove the porter off with his left hand and raise his right hand. He did this twice. Pistol in his right hand. Little Joe "tackled" the porter with pistol in his hand. The porter turned and left the prisoner free. The deceased entered the back door of the car, and ran up to the prisoner to grab him, his head to one side and eyes shut. He touched the prisoner with his hands, but did not clinch him. Just as the deceased was about to hit the prisoner, and before he hit him, the prisoner raised his pistol, put it at the deceased's face, and shot him. Little Joe shot the porter. The conductor thinks he shot first. From the time the conductor left the negroes in the white car until he met them in the colored car was not less than two, nor more than four, minutes. It was in this State. The deceased was a stout man. He had not talked with either of the negroes. They acted as if drinking. Witness thought they had been. The prisoner was, together with little Joe and Jones, indicted for murder. He was convicted of murder in the first degree, and appealed. The other defendants were convicted of murder in the second degree, and did not appeal. •

It was in evidence that the negroes had just come from Virginia, and they were incensed at the legal requirement in this State for the separation of the races in the cars. The prisoner was avowing their determination to "fight for one another; that they would die for one another." The prisoner "lunged" at the conductor, and hit him with his fists. The porter shoved him back, whereupon he drew his pistol. At this, three of the prisoner's comrades shoved the conductor into the smoking room, and one of them shot the porter. The conductor saw the prisoner shove the porter off and twice raise his right hand with his pistol in it. The jury had a right to infer from this action, from his comrade shooting the porter,

from the prisoner's declaration that they would fight and die together, and from his shoving back the porter, and twice raising his hand with his pistol in it, that the prisoner's intention was to get room to level his pistol at the conductor. There were premeditation and forethought in this. He shoved the porter back. Then he raised his hand with the pistol in it, lowered it, and raised it again with the pistol in it. What that purpose was, the jury alone could decide, not the court. If it was to shoot the conductor, there was not only the "instant of premeditation," which is all that is required by our authorities, but there was calculation, method—a determination to get a good aim, and room to level the pistol at his object. Just then the deceased—roadmaster of the railroad company—entered the car and rushed to grab the prisoner. His object evidently was to seize the prisoner and prevent his shooting the conductor, and the prisoner, balked of his intention to shoot the conductor, turned and shot the deceased. This would seem the only reasonable motive, and certainly the motive was to be drawn from the conduct of the prisoner and the surrounding circumstances, and was a matter which the judge properly left to the jury. If the prisoner was, with legal premeditation, however brief, intending to shoot the conductor, and shot the deceased because he was interfering to prevent it, this was murder in the first degree—as much so as if he had killed the conductor. It was no sudden gust of passion, but an execution of his already informed intention to kill, by killing the man who attempted to prevent him. It was premeditated killing, though the time was shorter in the selection of his new object. The facts of this case duplicate those in *State v. Benton,* 19 N. C., at page 223, where Judge Gaston says: "The accused was engaged in a most wicked act, not unlikely to terminate in murder. It was the duty of every by-stander to interpose and stop this career of violence. The deceased at this moment

came up toward the parties, when the prisoner instantly turned from the first contemplated victim of his vengeance, advanced, and, without a word of warning, plunged a knife into him and killed him.   We can discover no provocation on the part of the deceased to change the character which the law impresses on the fatal deed—the character of wilful murder."   The matter was properly submitted to the jury, and, it seems to me, with instructions too favorable to the prisoner.

His Honor charged the jury: "If the killing of Stevens was not the result of an effort to kill Clements, but was intentionally done, then the prisoner could not be convicted of murder in the first degree for such killing unless the jury find, beyond a reasonable doubt, that the prisoner, before the shooting, coolly determined to kill Stevens, and had deliberated and premeditated on it, and, as a result, had formed a fixed purpose to kill.   In other words, to convict the prisoner of murder in the first degree, you must be satisfied, beyond a reasonable doubt, either that the prisoner had, with deliberation and premeditation, formed a fixed purpose in his mind, before he shot, to shoot and kill Clements, and, in an effort to do so, killed Stevens, or he had, with deliberation and premeditation, formed a fixed purpose to kill Stevens, and, in pursuance of such fixed, determined, premeditated, and deliberate purpose, he did kill Stevens.   In either of these situations, he would be guilty of murder in the first degree." The prisoner excepted to so much of the charge as submitted the question of his guilt of murder in the first degree; but, as I understand the law, this charge was not only not unfair to the prisoner, but was more favorable to him than he was entitled to.   The evidence was sufficient to go to the jury, to show that the prisoner had, with deliberation and premeditation, formed the purpose in his mind to do murder; and, with this purpose fixed in his heart, it makes no difference upon whom his vengeance was wreaked, and particularly

STATE *v.* COLE.

is this so in this case, where the killing is a part of a continuous transaction. *State v. Benton,* 19 N. C., 223; *State v. Shirley,* 64 N. C., 610; *State v. Smith,* 2 Strob., 77; 47 Am. Dec., 589; *Holmes v. State,* 88 Ala., 26; 16 Am. St. Rep., 17; *People v. Miller,* 121 Cal., 343; *Hopkins v. Com.,* 50 Pa., 9; 88 Am. Dec., 518. I think the judgment should be affirmed. I concur in the opinion of the court sustaining the sufficiency of the indictment.

Every dissenting opinion is necessarily a declaration that, in the opinion of the dissenting member of the court, the law has been erroneously declared by the majority. It is not every time, however, that a judge who disagrees with the majority is justified in dissenting. The matter should either be of enough importance to justify putting his dissent on record, in the prospect that on some future occasion the court may change its views, or the matter should be of such a nature that the dissenting judge deems it to the public interest to point out the injurious consequences which in his judgment will result from the principles laid down in the opinion of the court. Especially should this be the case when, as here, the dissent is against granting a new trial to one convicted of a capital offense.

There is nothing that is more subversive of good government than lynchings, yet more men have been executed in this mode in North Carolina in the last fourteen years than by lawful process, and some years twice as many, as appears by the reports of the Attorney-General. The last message of the Governor of the State reports eight executed by lynch law in the last two years, of whom three only were lynched for rape, and in the same period only five were executed by the sheriff for all offenses. The frequency of lynchings has dulled the popular perception to the dangerous demoralization which will result from such punishments inflicted "outside of the law." Not long since, a coroner's jury impaneled to sit

upon one executed in this method, in one of the most intelligent counties of the State, passed resolutions eulogizing the lynchers, and the grand jury of an adjoining county officially indorsed their action by a resolution. In the case of this very prisoner (the appellant), and in numerous others known to all men, a military guard had to be ordered out, at much expense, to protect the prisoner till a legal trial could be had, and frequently the accused have had to be brought to Raleigh for safekeeping. There need not be and should not be such conflicts between the public desire for the repression of crime, and the execution of that will through their properly constituted public officials and servants.

In a free country, law is simply the expression of public opinion, formulated through the servants of the people elected for that purpose. The lynchings in this State, as elsewhere, are a declaration that public opinion is not yet in favor of the abolition of capital punishment, and show that there is in many quarters a lack of confidence in the certainty of the execution by the properly constituted authorities of the law, which requires the infliction of such punishment for murder and rape. When public confidence is restored, in the certainty of the execution of the law in this particular, lynchings will cease. The evil can only be removed by destroying the cause.

It has not been alleged in any quarter that those selected to execute the laws in any of the three departments—executive, legislative or judicial—are lacking in integrity, learning and devotion to their duty, but we know this, that, whereas, by the Attorney-General's report in 1890 (when criminal statistics were first reported), there were for the two years, 1889-1890, indictments for murder (of whom two only were hung by process of law) 96.

Rape, 25.

Manslaughter, 15.

Total all criminal cases, 10,437.

There were by the Attorney-General's report in 1902, for the two years, 1901-1902, indictments as follows:

Murders, 191.

Rape, 37.

Manslaughter, 60.

Total criminal cases, 17,610.

These are the official reports of the Superior Court clerks, compiled by the Attorney-General, an officer of this department, and being published by authority of law, we take judicial notice thereof.

The great expense of criminal courts is borne by law-abiding citizens, that men and women may be secure in their persons, their lives, and their property, and the great object of punishment is to lessen crime by deterring others from its commission. The above figures show that this object is not being attained, but, on the contrary, the reverse. The figures are official, and have been published by the State under authority of the General Assembly, and for this very purpose of furnishing information whether the method of executing the law is such as to decrease crime, or needs amendment to that end. The number of murders in London last year, with its 6,000,000 of people, drawn together from all parts of the globe and all classes of men, is shown by the police reports to have been 20. North Carolina has less than one-third of the population, and, with one of the most homogeneous people in the world, makes the above showing in her published official reports. That evil doers should so multiply among us can be due only to some defect in the execution of the laws, which should, but too evidently does not, repress and diminish crime. The existence of lynchings is but one form of public protest, and is one from which only evil can come.

What are the defects in our administration of justice which should be remedied, it may not be proper, in a judicial opin-

ion, to indicate; but, as a justification of my dissent in this case, it is enough to say that, in my judgment, the ruling here made, by increasing the difficulty of sustaining convictions for murder upon such a state of facts as is here shown, is, in my judgment detrimental to the public welfare.

Whatever the cause, the number of murders has doubled in twelve years, while manslaughter has increased fourfold, and other crimes 70 per cent. And it must be remembered that there are a large number of homicides, which, because committed in self-defense or for other reasons, have not been indicted, and are not included in the above numbers; and, indeed, the number of homicides in this State last year has been unofficially reported and published as being 285—how correctly, can not be ascertained. Thinking, as it is my right of dissent to say, that the judgment of the court is erroneous as a matter of law, I should not have put myself on record with a dissenting opinion if I did not think that my highest duty to the public welfare required this dissent to a ruling whose harm will go farther, in my judgment, than the release of this appellant from just punishment for the capital offense of which a jury have found him guilty. The conviction of the prisoner was a matter for the jury. I have viewed with unfeigned alarm the growing disposition to take cases from the jury, both in civil and criminal matters, upon the ground, unknown to the elders (see opinion of Bynum, J., in *Wittkowsky v. Wasson,* 71 N. C., 458, and Douglas, J., in *Coble v. R. R., Co.,* 122 N. C., 900, that there is not sufficient evidence, when the twelve men who are by the Constitution sole judges of the facts have found the evidence sufficient to compel a unanimous verdict, and the trial judge has refused to set aside their action, as he is vested with the power to do.

In a trial for any capital offense, apart from any other reasons, the mode of trial prescribed by legislation, of itself,

STATE *v.* COLE

renders a conviction for murder in the first degree almost an impossibility in this State, except in cases of sheer poisoning or lying in wait, if the prisoner is able to retain able and skilful counsel. If the abolition of capital punishment was embodied into law, and was a fair expression of public opinion, this would be proper. But because this practical abolition of capital punishment is not according to the law, which still denounces capital punishment in certain cases, and is contrary to public opinion, we have lynchings, to threaten public order, and the great increase in homicides, as shown from our official reports. In a trial for a capital offense, formerly the prisoner was neither allowed counsel to speak for him, nor compulsory process to summon witnesses in his behalf, nor the right to cross-examine the witnesses for the State. To mitigate this barabarism and injustice of the common law, a great disparity in the number of challenges was given the prisoner. Now, though the above disadvantages to the prisoner have been removed, the prisoner has still 23 peremptory challenges, while the State has only 4, besides his unlimited number of challenges for cause. It is only necessary for the prisoner to "run" for one man on the panel who is friendly to him, for, if he can secure that man by the rejection of 23 others besides those stood aside for cause, he has defeated the unanimous verdict which is requisite for conviction.

The prisoner has, and should have, the benefit of the presumption of innocence, and that the jury should be convinced of his guilt beyond a reasonable doubt; and he has also the unavoidable advantage that every judge who sits in the trial court and in this court has, like the writer, more or less often been counsel for those charged with crime, and naturally views every cause, more or less, from that standpoint, and with the natural sympathy any humane man must feel for any one who is on trial for his life. In addition, in our State, the jury must be unanimous, and the failure to agree of 1

juror out of 12 defeats conviction. This has been changed in some of the States, it having been found necessary, in order to secure the administration of justice, to require only a two-thirds or a three-fourths vote; but the people of this State will be slow, probably, to abolish the requirement of a unanimous verdict. The State, however, is further handicapped in capital cases, and without any reason, by the prisoner being allowed 23 peremptory challenges to its 4. This has been changed in most of the States, which now allow an equal number of peremptory challenges (usually 6 or 10) to each side. Then the defendant in all criminal cases has the still further advantage that while the defendant can except, and review on appeal any ruling against him, the State can never except to any ruling, however erroneous, made in favor of the prisoner and against the prosecution. Formerly in North Carolina, and until changed by statute, the State could appeal from a verdict of not guilty (*State v. Haddock,* 3 N. C., 162; *State v. McLelland,* 1 N. C., 632), and should be allowed to do so again, in the interest of public justice. This is allowed in Connecticut and some other States. *State v. Lee,* 65 Conn., 265, and cases cited under that case in 27 L. R. A., 498, and 48 Am. St. Rep., 202. The sympathy of the jury and of the judge are naturally with one charged with a capital offense, lest he shall be convicted unjustly; but this natural tendency should not be added to by the matters above mentioned, and others not mentioned, which make the execution of the law in cases of those charged, however justly, with a capital offense, almost a dead letter, so far as a conviction carrying the death penalty is concerned.

Our statute law says murder shall be punished with death. In practice, in this State, and some others, the punishment is ordinarily a fine paid by the accused to his counsel as a fee, and a far heavier fine paid by the law-abiding people for the costs of the useless trial. The exceptions do not count;

STATE *v.* COLE.

being, as our Reports show, one, and never over two, in a hundred, executed by law, and double that number by lynchings.

It is useless to pass laws against carrying concealed weapons whenever men shall become convinced that slayers of men, however guilty, can only in rare instances be punished by law, and that real protection is really in their own pockets, and "getting the first shot." It will be equally useless to denounce lynchings, by statute or otherwise, in any locality where men in any considerable number believe that in no other way than by the fear of lynching can grave crimes be prevented, and that the fear of punishment by law is too vague and indefinite to deter men from the commission of capital offenses. The ever-increasing tide of crime should be repressed in an orderly and legal way, by the administration of the law by the courts, and resort to any other mode is evil, and evil only. But to do this, the administration of justice, especially in capital cases, should be more efficient. Any amendment which shall render it possible to convict the guilty will not, if properly framed, destroy any safeguard to those who are innocent. It is possible here, as well as elsewhere, to make legal proceedings more efficient without making them work injustice. Whatever our laws are, they should be enforced.

The passage of the bill to divide murder into two degrees was secured with the design of making the execution of the law more efficient, since juries might convict of murder in the second degree in cases in which they might acquit rather than convict of an offense calling for capital punishment. Unfortunately, however, the majority of the court, in *State v. Fuller,* 114 N. C., 885, ruled further, though there was no provision in the act on the subject, that the immemorial common-law presumption of guilt of the offense charged in the indictment, raised by proof of killing with a deadly weapon, was transferred, to be a presumption only of

murder in the second degree. Though there was a dissent in that case, this ruling has been so long acquiesced in that it can probably only be changed now by legislative enactment. The result, however, has been the almost practical abolition of convictions for murder in the first degree, which was not contemplated by the Legislature. In consequence of that ruling, the majority of the court felt unable to approve the verdict of murder in the first degree in *State v. Gadberry,* 117 N. C., at page 825, in which the prisoner was carrying off a little girl for purposes of lust, and upon her weeping and crying, and calling upon her father and mother and brother to save her, they came without any weapon, whereupon the prisoner pushed the child into the road in front of him, "put the pistol to the child's back, fired, and ran off into the woods." The verdict of guilty was set aside by this court. There is not a more horrible case in the books. In *State v. Bishop,* 131 N. C., 753, in conformity to the same precedent, the majority of the court felt compelled to set aside a verdict of murder in the first degree where four negro men went in a body to a store, grossly insulted a young white clerk, and, when they got him out doors, chased him around, firing fifteen or twenty shots at him, seven of which struck him, all in the back, and after he fell they stood by till one of their number fired two more shots into the dying man, when they all jumped into a wagon and rode off. In *State v. Thomas,* 118 N. C., 1113, a man cruelly beat his wife, was heard to threaten to kill her, then a heavy blow followed, her neck was broken, he threw her body into the water, and denied having touched her. Yet the court held there was no evidence of murder in the first degree and set aside the verdict. In *State v. Rhyme,* 124 N. C., 847, a negro being engaged in a row with another employee, the employer asked him in a gentle way as to the trouble, whereupon without provocation

STATE v. COLE.

he slew the employer and rushed off, boasting of the deed. The majority of this court set aside the verdict. At the following term of the court below, when the prisoner submitted to guilty of murder in the second degree, the presence of a company of soldiers was necessary to secure his safe conveyance to the penitentiary. This should not be the case in any country where the people make and execute the laws. There are several other cases in our books almost as bad. Enough has been done for those who murder. It is time the courts were doing something for those who do not wish to be murdered.

> " *Mercy but murders, pardoning those who kill.*"
> —Shak.

The eminent judges who made the precedent in *State v. Fuller* could not and did not see how far it would be carried. In the present case, the deceased, unarmed, was simply trying to prevent the murder of the conductor. The prisoner killed him for trying to prevent it. There was no provocation. It seems to me that this is clearly murder in the first degree, and that I should say so.

Regretting to differ from my brethren in any case, and especially in a case of this nature, a high sense of public duty compels me to enter my dissent to a ruling which is according to precedent as they see it, but which to my view, is not only clearly erroneous in law, but must have a detrimental effect upon the due administration of justice. If what is here said shall in any way bring about increased efficiency in the administration of justice, and moderate or reduce the growing volume of crime, which has increased 70 per cent. in twelve years, and doubled the number of true bills for murder and quadrupled the number of indictments for manslaughter in that short space of time, this dissent will not have been written in vain. The fear of prompt and certain punishment can deter from crime, and reduce the frightful and growing number of

homicides; else why have a costly administration of justice at all? It is certain that under our present procedure in capital cases, and the construction placed by the court on the act dividing murder into two degrees, that punishment in such cases is very far from certain.    Men do not fear the law enough to refrain from gratifying their evil passions.    These things should be plainly said, and, if the only relief is in legislation, law-abiding citizens should know it, that a sound public opinion may apply the remedy.