John W. Wilson, a witness for the State, testified: "I am a cousin of the prisoner. On 22 September, I was at Edge's store, in Yancey County, at a shooting match for a turkey belonging to prisoner. Deceased was there. After several shots had been fired a shot hit near the turkey. Deceased came down to where I was, and he and I went to the turkey and found that it was not hit. Prisoner then came from the store towards where I and deceased were, talking loud. I told prisoner not to go to the turkey that we would score it. Prisoner said he would go to it. Deceased said to prisoner, `John, there is no use to go; I do not claim it as a hit.' Prisoner went on to the turkey, hollering and swearing and looking back towards the store. After getting to the turkey prisoner hollered back to the persons at the store, `Shoot; any man that hits the turkey shall have it.' Prisoner then came back to (869) where deceased was standing, and some one near the store fired at the turkey and prisoner hollered twice, `Shoot again; you have not touched it.' Deceased then started slowly towards the turkey. Prisoned turned to deceased and said to him, calling by name, `Where are you going?' Deceased said, `John, I was just going to see where they hit.' Prisoner said, `Don't go.' Prisoner then walked two or three steps towards deceased, and run his hands in the pocket of his overpants on the left side and pulled out a pistol and presented it at deceased, and told him to stop or he would shoot him. Deceased stopped, and looked back at the prisoner and said, `Why, John, I was just going down to see where they hit.' Deceased then turned and walked towards the turkey. Prisoner then started towards him, saying he would shoot him if he went down there, and swearing. Deceased went on, and prisoner after him, until he got to about where the ball hit near the turkey. Deceased turned back. Prisoner said to deceased, `What did you come down here for when I told you not to?' Deceased said, `I just came down to see where the ball struck.' Prisoner said, `You have sworn, or told, damn lies on me and I am going to kill you for it.' When he said this he held his pistol in both his hands and had it presented at the deceased. Deceased said something in a low tone which I could not understand. The prisoner then lowered his hands a little and raised them again and fired at deceased. The smoke of the pistol hid the deceased for a moment, and then I saw the deceased coming round the right of the prisoner, walking sidewise, staggering and hollering, `O Lord! O Lord!' I ran a few steps toward the store and hollered for those up there to come down. I then looked back and saw the deceased fall and prisoner was standing over him, waving his pistol and saying, `Damn you, I told you I would do it.' Prisoner was four or five steps from the deceased when he fired. I went *Page 600 
(870) back to the store and when I got there I looked back and saw the prisoner running away from the deceased and other persons. We followed him and overtook him about 400 yards from deceased. When we first approached him he turned and threw up his pistol towards us, when some one said to him `If you don't drop that pistol we will shoot you." Prisoner then dropped his pistol on the ground and we arrested him. I said to prisoner when we arrested him, `You have killed Tom Edge; don't you know you will be hung for it?' He replied, `Yes, I know I have killed him; I did it because he swore a damn lie against me; and if it is right to hang me let them hand me.'"
"I have known the prisoner ever since I could recollect; think he knew right from wrong when he killed Edge, and always did when I was with him."
On cross-examination witness said: "I heard no disturbance between prisoner and deceased that day; prisoner did not seem to be mad when he came down toward the turkey, but did seem to be mad when he told deceased not to go to the turkey. The prisoner was pretty drunk. I have seen him drunk a great many times before and seen him cut up when drunk."
Another witness, after testifying to substantially the same facts, said: "I saw the prisoner before the homicide drink something from a bottle. He seemed to be drunk. I have seen him drunk a few times, and when drunk he generally cuts up, talks loud and sems [seems] to be overbearing. He was hollering and cursing the day of the homicide. I have known him ever since I can recollect. I think at the time of the homicide he knew right from wrong."
There was much testimony introduced, pro and con, touching the defendant's sanity. It appeared that some time prior to the homicide he had received a blow upon the head which had for a considerable time thereafter seriously affected the brain; that when sober he was rational and knew right from wrong, but was easily excited by liquor, and (871) that several of his near relatives were persons of unsound mind.
The counsel for the prisoner submitted in writing to his Honor the following questions for the jury, to wit:
"If the defendant drew his pistol and presented it, not intending to shoot the deceased, but to drive him away by a show of force, and by the careless and negligent handling of the pistol by the defendant it accidently [accidentally] fired and killed the deceased it is but manslaughter; and in investigating this case the jury must consider the want of provocation, the absence of malice, the friendly relations of the defendant and the deceased immediately preceding the act, and the mental and physical condition of the defendant at the time; and while drunkenness is no mitigation for crime, it may be taken into consideration by the jury in this *Page 601 
case as a circumstance to be considered by the jury for what it is worth in determining the defendant's claim that the shooting was accidental.
His Honor declined to give these instructions, but among many other things not excepted to he told the jury that if they believed from the testimony in the case that the prisoner slew the deceased in the manner, with the weapon and under the circumstances testified to by the State's witnesses, then there was no evidence for them to consider of an accidental killing, nor was there any evidence before them of any justification or excuse for the killing, and they should find the prisoner guilty of murder or nothing, according as they should find other facts, about which he should afterwards instruct them.
He further told the jury "drunkenness was no excuse or mitigation of crime, though insanity or unsoundness of mind, produced as the secondary effect of long and continued or excessive drinking of spirituous liquors, was, if it so deprived a man of reason that he could not perceive the moral qualities of actions or tell right from wrong, a complete excuse for anything he did, the same as if it had been produced by any other cause or come from the visitation of God. And, (872) further, that if the prisoner was so mentally and physically constituted by nature, or became so constituted by a blow or blows rendered on the head several years before the homicide, that when he drank liquor he lost his reason and became furious and unable to control himself, and knowing this voluntarily drank liquor at the time of the homicide, and by the immediate effects of the liquor became frantic, even to the extent that for the time being he did not know right from wrong, and in this condition slew the deceased without justification or excuse, he would be guilty of murder, and they should so find; but if they found that at the time of the homicide the prisoner, by reason of blows received on the head years before, or from the remote and secondary effects of excessive drinking, or by a hereditary taint, or the visitation of God, was so far of unsound mind that he could not judge of the moral quality of the act which he did, or know whether it was right or wrong, then they should acquit the prisoner.
There was a verdict of guilty of murder, and from the judgment pronounced thereon the defendant appealed.
The court very properly declined to give the jury special instructions prayed for by the prisoner, because there was no evidence produced on the trial tending to prove that he slew the deceased by accident, nor was there evidence in any aspect of it that could *Page 602 
mitigate the offense to manslaughter. It was clearly a case of willful and unprovoked murder, unless the prisoner was insane at the time of the homicide. The deceased had given him no legal provocation; indeed, no provocation at all. He said to the deceased just before he fired the fatal shot: "You have sworn or told damn lies on me, and I am going to kill you for it," and very shortly afterwards a witness said to (873) him he had killed the deceased, and he replied, "Yes, I know I have killed him; I did it because he swore a damn lie against me, and if it is right to hand me, let them hand me." This was evidence of motive and express malice.
The court should never give the jury instructions based upon a state of facts not presented by some reasonable view of the evidence produced on the trial, nor upon a supposed state of facts. Such instructions are not pertinent, and they generally tend to mislead or confuse the jury, more or less. The jury should see the issues, stripped of all redundant and confusing matters, and in as clear a light as practicable. If such impertinent instructions should prejudice the prisoner he would be entitled to a new trial; if they should prejudice the prosecution, there would be no remedy. S. v. Collins, 30 N.C. 407; S. v. Lambert, 93 N.C. 618.
The evidence tended thoroughly to prove that the prisoner was not an insane person, and particularly that he was not insane at the time he slew the deceased, but the court gave him the full benefit of the evidence offered and received, tending — not strongly — to prove insanity. The instructions given the jury in this aspect of the case were very favorable to the prisoner — certainly they were not such as he could justly complain of. Drunkenness and mere drunken excitement and rage constitute no excuse for crime. S. v. Potts, 100 N.C. 457.
Cited: S. v. Kale, 124 N.C. 819; S. v. Murphy, 157 N.C. 617; Irvinv. R. R., 164 N.C. 18.
(874)