CLARK, J., dissenting.
The prisoner was indicted and convicted of murder in the first degree, and from the judgment of the court he appealed. There are some exceptions taken to the charge, but we have examined them with care and do not think they can be sustained. The charge seems to be a full, clear and correct enunciation of the law of murder in the first and second degrees, as its exists under the statute of 1893. The error, if there be error, is in submitting the question of murder in the first degree to the jury upon the evidence in the case. That Thomas Falls had been killed by the prisoner with a deadly weapon, was clearly shown — indeed, not denied. Under the law as it existed before the act of 1893, malice would have been presumed from these facts, and nothing else appearing, the killing would have been murder. The same rule, as to killing with a deadly weapon and the presumption of malice that existed before the act of 1893, still exists, but is only applicable to murder in the second degree; and the burden is still on the prisoner to show facts in extenuation, mitigation or excuse to reduce the grade of the crime below that of murder in the second degree, or to justify or excuse the killing. As the killing with a deadly weapon was proved (in fact, not denied), and the prisoner having offered no evidence in extenuation, excuse or justification, the court (849) would have been justified in telling the jury that if they believed the evidence the prisoner was guilty of murder in the second degree.
But since Laws 1893, ch. 85, dividing murder into two degrees, these rules of the common law do not apply to murder in the first degree; or, speaking more accurately, it takes more than this to constitute murder in the first degree; that, outside of the specified offense named in the *Page 534 
statute, the killing must be "wilful, deliberate and premeditated"; and this must be shown by the State beyond a reasonable doubt before it is justified in asking a verdict of guilty of murder in the first degree.
As the case depends upon the sufficiency of the evidence to justify a verdict of murder in the first degree, we think it proper to give the evidence upon which it was found: Mr. Grissom, an employee of the deceased, living and boarding with the deceased, went with him from his house to the cotton-gin, and who saw and heard the whole matter, testified "that as he went from the store to his supper, he heard a fuss — a row going on between Frank Parish, an employee of the deceased and the prisoner, who had brought a load of cotton to the gin for a customer. After he got to the house he continued to hear the row going on, when a daughter of the deceased informed her father that a fuss was going on between some person at the cotton-gin; that deceased came out on the piazza where the witness was, stopped a moment and started towards the gin-house." Witness went with him, and further testified: "Witness went with him to the gin-house about twenty-five yards from dwelling. Just across the public road as Falls (the deceased) started up the steps of the platform, prisoner was standing on the platform. Prisoner stepped off the platform into a (850) wagon and from there to the ground. Falls went up the steps and asked Frank Parish what the fuss was about. Frank said that a negro had called him a son of a bitch — said that was more than he could take from any negro. Falls told Frank to shut up and go back to his work — there wasn't any use of that. It was Falls' gin-house. Frank Parish was working for Falls. Falls then turned and went down the steps — went around the wagon where prisoner was standing by a tree. Falls said `are you the man that has been fussing here with Frank Parish?' and said this a second time. Prisoner made no answer to the first question and he asked him the second time. As he asked him the second time Falls put his left hand on the prisoner's right shoulder or arm and asked him to come to the light, he wanted to find out what all this fuss was about. Just then the prisoner stabbed him and jumped back, and said `hands off.' Prisoner jumped back about three or four feet. Falls turned to witness and said he has stabbed me and he has ruined me, and he ought not to have done it; and then as soon as Falls spoke to witness, the prisoner ran and Falls turned and went into his house. Witness left him at public road and went to store and `phoned for a doctor. Witness was in about two feet of deceased at the time he walked up to prisoner. Prisoner didn't open the knife after Falls got there — he didn't put his hands in his pocket — from time prisoner got off the platform till Falls was stabbed, was about five minutes. Falls spoke to prisoner in a kind way *Page 535 
and laid his hands on prisoner just merely to ask him to go round to the light, there was no rudeness about it. Witness saw prisoner no more that night. When Falls was on the platform his manner was gentle — asked Frank what the fuss was about, and Frank said that the negro called him a son of a bitch and this was more than he could take. It occurred on 17 November, 1898, between 6 and 7 o'clock in the (851) afternoon. Falls lived three days after that."
The witness was then cross-examined and testified as follows: "Witness went up on platform with Falls and went back with him, when he went down off the platform, and followed him around to where prisoner was. Witness saw prisoner jump off platform into wagon when Falls started up steps — saw him step out of wagon to the ground — didn't see him while witness was on platform talking to Parish. Witness and Falls both walked up to prisoner. Falls, before he laid his hands on him, asked prisoner `Are you the fellow who has been fussing around here with Frank?' and asked witness, `What all this fuss was about?' He laid his hand on him just as he asked him to come around to the light. Falls knew the prisoner. Witness had seen prisoner before this time. Parish said to Falls that the negro, Phonse Rhyne, had called him a son of a bitch, and this was more than he could take from any negro. Prisoner was in hearing distance of this remark from where he was when witness got to him. When witness and Falls went around to prisoner, he was 10 or 12 feet from wagon. When witness last saw prisoner before he found prisoner, he was stepping off the wagon, and he was then in hearing distance of the remarks of Falls — and at the tree he was in hearing distance, unless the machinery prevented him. When witness went around to prisoner he was standing by a tree. As witness and Falls approached from the house, Parish and prisoner were quarreling. The fuss ceased when Falls started up the platform. Falls, with his left hand, caught the prisoner's shoulder — laid his hand on his shoulder — arm rather. Falls weighed 225 pounds or 215 pounds — height about 5 feet 11 inches, probably six feet — he was fleshy — not extra active — he was an energetic man — attended to a great deal of business."
We have quoted the entire evidence of this witness, and while (852) there was some other witnesses examined, there was nothing new elicited. And the evidence of this witness may be said to be the evidence in the case. There was a witness who testified that just after the homicide had taken place, some one ran by him, and he supposed it to be the prisoner (it was dark), saying he would kill him — that he would cut his guts out. And while such evidence might possibly be used to show malice, were that necessary, it is not seen how it can be evidence of premeditation and deliberation, which is the point upon which the case turns. *Page 536 
Probably one of the most difficult things that presents itself to a judge presiding at the trial of an important case — a capital felony — is to say whether there is such evidence of guilt (in some cases) as should be submitted to the jury. And it is with reluctance that this Court, after the court below has submitted the matter to the jury and they have found a verdict of guilty, holds that there was no testimony, or no such testimony of the prisoner's guilt as should have been submitted to the jury. But we find that this Court, in the discharge of its duty, has done so in a number of cases. Of the more recent cases we may name S. v. Miller,112 N.C. 886; S. v. Thomas, 118 N.C. 1121; S. v. Wilcox, ib., 1181, andS. v. Gragg, 122 N.C. 1082. These were all convictions of murder in which new trials were granted upon the ground that the evidence was not sufficient to justify the verdict of guilty.
The law is fixed by the statute, that the killing must be wilful, and that it must be done upon premeditation and with deliberation. The statute of 1893 making this change in our criminal law is a very important one, and like all new statutes of such great importance, it has given this Court trouble to be always able to determine its meaning and to make a (853) proper application of it to the cases in which it is presented. But since it was passed, it has been presented in quite a number of cases where it has been considered and construed by this Court. It, therefore, becomes our duty to consider it now in the light of these decisions and apply it to this case.
In civil cases, where the issue depends upon the weight of the evidence, there must be more than a scintilla of evidence — "there must be evidence from which the jury might reasonably come to the conclusion that the issue was proved." Wittkowsky v. Wasson, 71 N.C. 451. This case has been cited with approval in Lyne v. Tel. Co., 123 N.C. 123; Thomas v.Shooting Club, ib., 288; Spruill v. Ins. Co., 120 N.C. 141, and many other cases. This being the rule in civil cases, it must be at least this strong in State cases, where the issue does not turn upon the weight of evidence, but where it must be proved beyond a reasonable doubt.
The killing with a deadly weapon being proved (not denied) the question is, was this killing done upon premeditation and with deliberation? or, to more correctly state the question presented, is there any evidence "from which the jury might reasonably come to the conclusion" beyond a reasonable doubt that this homicide was committed upon deliberation and withpremeditation?
In S. v. Fuller, 114 N.C. 885, where the act of 1893 was first considered by this Court, it is said: "The use of a deadly weapon does notipso facto bring the killing within the definition of murder perpetrated by means of poisoning, lying in wait, imprisonment, starving, torture, *Page 537 
or by any other kind of wilful, deliberate or premeditated killing." "Probably 99 out of every 100 homicides are caused by the use of a deadly weapon, and if every case where its use is provoked by insulting language (not deemed provocation in law) which is resented with fatal result on the spur of the moment, the offense is presumably (854) murder, but little has been accomplished by the legislative attempt to classify cases which before fell within the definition of murder." In this case, there was an assault and battery, deemed in law provocation.
It is next considered by this Court in the case of S. v. Norwood,115 N.C. 789, where the Court uses this language: "In order to convict of murder in the first degree . . . it was necessary that the State should show that the prisoner deliberately determined to take the child's life."
Murder under the act of 1893 is again considered in S. v. Thomas,118 N.C. 1113, where it is said: "In order to constitute deliberation the premeditation, something more must appear than the prior existence of malice, or the presumption of malice which arises from the use of a deadly weapon. Though the mental process may require but a moment of thought, it must be shown, so as to satisfy the jury beyond a reasonable doubt that the prisoner weighed and balanced the subject of killing in his mind long enough to consider the reason or motive which impelled him to the act, and to form a fixed design to kill, in furtherance of such purpose or motive."
In S. v. McCormac, 116 N.C. 1033, the act of 1893 is considered and the Court says: "It must have appeared in some aspect of the evidence that the accused deliberately determined to kill the deceased before inflicting the wound, in order to warrant the judge in submitting the question of his guilt, on the charge of murder in the first degree, to the jury." The same doctrine is held in a number of other cases, but these are sufficient to establish the rule.
The evidence in this case is quoted above, and, in our opinion, (855) does not prove or tend to prove that the killing was done upon premeditation and with deliberation, tested by the rule established by this Court.
The prisoner and the deceased knew each other. They were friendly so far as appears from the evidence, until the moment of the homicide. The prisoner was lawfully there — we may say by invitation, as the deceased seems to have been the owner of a public cotton-gin, and the prisoner was the servant of one of his customers, and had brought a load of cotton to the gin of the deceased. The prisoner and Parish, an employee of the deceased, got into a fuss. The deceased went from his dwelling-house to the gin-house. The fuss between Parish and the *Page 538 
prisoner stopped when the deceased got there. The prisoner left the platform of the gin-house and went ten or twelve feet off on the ground, by a tree. It was dark. The deceased and Grissom, an employee of deceased, went to the prisoner, and the deceased said to prisoner, "Are you the fellow who has been fussing around here with Frank Parish?" (Cross-examination.) The prisoner made no answer, the deceased repeated the question, and as he did so, he placed his hand on the prisoner's shoulder and said, "Come around to the light and tell me what the fuss was about." At this moment the fatal stroke was made. The prisoner jumped back and said, "Hands off."
Where is the evidence of deliberation and premeditation? It cannot be inferred because it was done with a deadly weapon. He was mad but not with deceased, who had seemed to be his friend until the deceased put his hand upon him and said, "Come around to the light and tell me what this fuss is about." The prisoner being mad, it seems that this assault was the cause of the impulse and the fatal blow. To put any other construction upon this transaction would be unnatural, unreasonable and unwarranted by the evidence in the case.
(856) It was contended by the State that the manner in which the homicide was committed afforded sufficient evidence of deliberation and premeditation to justify the jury in finding a verdict of murder in the first degree, and S. v. Dowden, 118 N.C. 1145, is cited to sustain this contention. We do not think so. S. v. Dowden is easily distinguished from this case. There, Dowden was unknown to the deceased — had gone upon the deceased's engine without permission — was a trespasser — was ordered off and refused to go — was put off by the deceased, but he did not give the fatal blow at that moment. After the prisoner got on the ground he claimed to have dropped his hat, and asked the deceased to hold his lantern so he could find his hat, which the deceased did, when the prisoner picked up his hat, the deceased turned around, and the prisoner shot him in the back. The simple statement of the facts makes the distinction between that case and this so apparent that we will not discuss it.
After a full consideration of this case we are compelled to order a new trial for the reason that we are of the opinion there is no evidence to support a verdict for murder in the first degree.
NEW TRIAL.