STATE OF NORTH CAROLINA v. CLAUDE BUCHANAN

No. 57

(Filed 6 June 1975)

1. Homicide § 21— motion for nonsuit — sufficiency of evidence at issue

     When an indictment charges a defendant with first degree murder, a motion for judgment as in case of nonsuit requires the trial court to determine whether the evidence, when taken in the light most favorable to the State, is sufficient to raise a legitimate inference and to permit the jury to find that a defendant, after premeditation and deliberation, formed a fixed purpose to kill and thereafter accomplished this purpose.

State v. Buchanan

**2. Homicide § 4— premeditation defined**

Premeditation means thought beforehand for some length of time, however short.

**3. Homicide § 21— first degree murder — sufficiency of evidence**

Evidence in a first degree murder case was sufficient to permit the jury to find that defendant acted after sufficient premeditation and deliberation where such evidence tended to show that defendant knew deceased had stolen wood on previous occasions, defendant secreted himself in a nearby field with his shotgun on the day before the killing hoping to catch deceased stealing more wood, on the day of the killing defendant saw deceased's truck pass by his home and back into a driveway where cut wood was located, defendant drove his truck to the driveway and blocked it, defendant ordered one man to drop wood which he held, the man did so, defendant then shot deceased, deceased did not advance on defendant, and defendant saw no weapon or anything else in the possession of deceased at or before the fatal shot.

**4. Constitutional Law § 36; Homicide § 31— first degree murder — death penalty proper**

Upon defendant's conviction of first degree murder, the trial court did not err in signing the judgment committing him to death by asphyxiation.

**5. Homicide § 18— premeditation and deliberation — proof by circumstantial evidence**

Ordinarily, it is not possible to prove premeditation and deliberation by direct evidence, but such elements must be established by proof of circumstances from which they may be inferred; among the circumstances to be considered by the jury in determining whether a killing was with premeditation and deliberation are want of provocation on the part of the deceased, the conduct of defendant before and after the killing, the use of grossly excessive force, or the dealing of lethal blows after the deceased has been felled.

**6. Homicide § 25— first degree murder — instructions unsupported by evidence**

Defendant in a first degree murder prosecution is entitled to a new trial where the court instructed the jury that they could "infer" premeditation and deliberation from "the dealing of lethal blows after the deceased has been felled and rendered helpless" and from the "vicious and brutal slaying of a human being" where there was no evidence that defendant assaulted deceased or otherwise dealt lethal blows after he was felled and where the facts failed to disclose a vicious and brutal killing.

DIRECT appeal pursuant to G.S. 7A-27(a) to review defendant's trial before *Friday, J.*, at the two-week September-October 1974 Regular Criminal Session of JACKSON County Superior Court.

The two-week regular criminal session commenced on 30 September 1974 and defendant's case (No. 74CR861) was called for trial on 3 October. Defendant was charged in a bill of indictment, returned at the May, 1974 Session, with the first-degree murder of Everett Manuel Mills on 15 April 1974. Upon arraignment, defendant entered a plea of not guilty. Thereafter, at the trial, both the State and the defendant presented evidence. The jury returned a verdict finding defendant guilty as charged and Judge Friday entered judgment on this verdict imposing the death penalty.

The State's evidence, summarized except where quoted, tended to show the following:

On 15 April 1974 Everett Manuel Mills (hereinafter deceased), his brother, Roy Mills, and his brother-in-law, Robert Shook, were working on Russell Beutell's Christmas tree farm near Balsam Gap. At approximately 4:30 p.m. they stopped work for the day and drove over to Waynesville where Roy Mills purchased two cases of beer. Afterwards, they drove back by way of the Moses Creek Road in Jackson County. At approximately 6:00 p.m. they passed by the Tom Hooper property (hereinafter Hooper place), stopped the 1966 Jeep truck in which they were riding, and backed it into the Hooper driveway. Robert Shook got out, walked over to a nearby woodpile, and began loading wood into the truck. At this time, the Hooper place was under the control of defendant as caretaker.

Roy Mills described the subsequent events as follows:

While Robert Shook was loading wood defendant drove up to the Hooper place. He parked his truck directly in front of the driveway entrance and emerged with a shotgun. Defendant told Robert Shook to "throw the wood down" and added, "God damn you, I'll kill you all." After Shook had dropped the wood, defendant shot deceased, who was standing on the left side of the Jeep truck. This occurred at approximately 6:00 p.m. They said nothing to defendant prior to the firing of the fatal shot.

After the shooting, he and Robert went to the assistance of deceased, who was lying beside the Jeep truck, covered with blood. When they got deceased in the truck, they asked defendant to move his vehicle and went for help.

Robert Shook described these events as follows:

As he was picking up a couple of pieces of wood, defendant drove up, jumped out of his truck, shotgun in hand, and told him to throw the wood to the ground if he did not want his "God damn brains" blown out. As he was dropping the wood, defendant shot deceased, who was standing beside the Jeep truck. Thereafter, defendant reloaded his shotgun and told them to "move" if they all did not want to be killed. Deceased was quickly placed in the truck; defendant was asked to move his vehicle; and they went for help.

As to the prior relationship between defendant and deceased, Roy Mills and Robert Shook testified as follows:

*Roy Mills:* "They were good friends right on up to that minute. We never had any arouble right up until the very hour of 6:00 o'clock, or about 6:00, and none of us had ever had any trouble but good friends right up to the minute."

*Robert Shook:* "As far as I know, they had been good friends all this time and I have been a good friend of Mr. Buchanan. Me and him has been huntin' together."

Fred Holcombe, who was Sheriff of Jackson County on 15 April 1974, testified that later that evening he went to defendant's home. When he arrived, defendant was seated on the front porch. Defendant greeted him as follows: "Come in. I know what you're here for. I shot Manuel Mills." Sheriff Holcombe immediately advised defendant of his constitutional rights. Thereafter, defendant stated that he had seen the Mills' truck pass by his house earlier in the afternoon; that the truck had stopped in front of the Hooper place and had backed into the driveway; that on previous occasions certain personal property, including chopped wood, had been stolen from the Hooper place; that he suspected deceased was responsible for these prior thefts; that he got in his truck and drove up to the Hooper place; that upon his arrival, he picked up his shotgun and got out of his truck; that deceased said "I'll kill you"; and that he shot deceased. Defendant further stated that "[I]f a man tells me he is going to kill me, I'm not going to give him a chance."

While defendant was making the above statements, Sheriff Holcombe asked him: "Did Mr. Mills have any weapon, a knife or gun, or anything?" Defendant replied: "I didn't see any." Sheriff Holcombe also testified that defendant failed to tell him

that deceased had advanced on him or that deceased had his hands in his pocket at any time prior to the discharge of the fatal shot.

Sheriff Holcombe added that after defendant had made all of the above statements, he asked him to go over to the Mills' residence. He refused to go with defendant. Defendant then stated: "I watched this place, yesterday . . . I brought my shotgun and got in this grass field over there to see if anybody come down to this house to steal anything." The grass field defendant referred to was directly across from the Hooper place on the other side of Moses Creek and Moses Creek Road.

Sheriff Holcombe further testified that he had examined the clothing deceased was wearing at the time of the killing and had found a closed pocket knife in the righthand pants pocket.

At the conclusion of the State's case, defendant moved for a directed verdict on the charge of first-degree murder. This motion was denied and thereafter defendant offered evidence, summarized except where quoted, that tended to show the following:

Tommy Hooper testified that he and his brother owned the Hooper place and that they had appointed defendant caretaker of this property. Hooper further stated that he had never given anyone permission to remove wood, furniture, or other items from the property. However, he stated that the Hooper place had been leased to Robert Shook "up to about a month or six weeks prior to" 15 April 1974.

Defendant then took the stand and testified as follows:

He was a cousin of the Hoopers and had been in charge of the Hooper place for approximately eighteen years. Prior to the date of the killing, he had seen deceasesd and his brother "hauling wood" away from the property, but he had not previously confronted them about this.

On the afternoon of 15 April 1974 he saw deceased, his brother and his brother-in-law pass by his house in their Jeep truck. The truck thereafter proceeded up Moses Creek Road to the Hooper place and was subsequently backed into the driveway. After observing these events, he got in his truck and drove up to the Hooper place, a distance of approximately one hundred yards. He stopped in front of the driveway entrance

and saw deceased and Roy Mills seated inside of their Jeep truck drinking beer. Robert Shook was approximately forty feet from the Jeep truck, near the woodpile.

He got out of his truck and stated: "Boys, I don't want no trouble. I've done everything I could do to keep you 'uns out of here." Deceased responded: "Oh, Claude, this is the first time we've been up here stealing any wood." He then told deceased: "Wait a minute, Manuel, you was out here Saturday—I don't know if you was here Friday or not, but the door was kicked open Friday. I know you was here Saturday; I know you was here Sunday, and here it is Monday, and it's getting a everday business."

Following the above verbal exchange, deceased got out of the Jeep truck and said: "God damn you, I'll kill you." Thereupon, deceased proceeded to advance on him with "his right hand in his right pocket." He knew that deceased usually carried a pistol in this pocket. He repeatedly warned deceased not to come any closer. When deceased failed to heed a final warning, he "wheeled and grabbed" his shotgun, which was in the front seat of his truck, and "shot from [his ] hip." Thereafter, deceased, under his own power, got back in the Jeep truck. He [defendant] moved his own vehicle, which was blocking the drive, and the others drove off.

After a short time, he drove back down to his house and immediately called the sheriff's department. When Sheriff Holcombe subsequently arrived, he told him what had happened, i.e., that he had shot deceased in self-defense.

Defendant further testified that his shotgun was always loaded, 365 days a year, and that he was carrying it in his truck on the day of the killing because he had told a neighbor that he would shoot a crow for him. He denied ever telling Sheriff Holcombe that he had taken his shotgun and hidden himself in a field near the Hooper place.

As to his prior relationship with deceased, defendant testified as follows:

"I was acquainted with Mr. Manuel Mills and we were good friends. . . . I was acquainted with all of them and good friends with all of them. I and the Mills family have been good friends all our lives, visit back and forth once in a while, and Mr. Manuel Mills, especially, has been in my home from

time to time. . . . Not two weeks before [the day of the killing] he run out of gas right there in front of my house, and he asked me if I would let him have some gas, and I told him yes sir, all you have to do is siphon it out of my truck. Up until the moment this gun was fired, I had no ill will or bad feelings toward Mr. Manuel Mills. . . . "

*Attorney General Rufus L. Edmisten by Assistant Attorneys General William B. Ray and William W. Melvin for the State.*

*W. R. Francis for defendant appellant.*

COPELAND, Justice.

Defendant brings forward three assignments of error based on a total of three exceptions duly noted in the record.

Defendant first assigns error (Nos. 1 & 2) to the action of the trial court in denying his motion for "a directed verdict of not guilty" at the close of the State's evidence and in denying his motion for "nonsuit" at the close of all the evidence. The question presented by these assignments is whether the evidence was sufficient to warrant its submission to the jury and to support a verdict of guilty of the offense charged in the first-degree murder indictment. *See, e.g., State v. McCall,* 286 N.C. 472, 212 S.E. 2d 132 (1975); *State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712 (1974); *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974). Both of these motions have the same legal effect as a motion for judgment as in case of nonsuit. *See, e.g., State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305 (1975); *State v. Britt, supra; State v. Glover,* 270 N.C. 319, 154 S.E. 2d 305 (1967).

[1]   When an indictment charges a defendant with first-degree murder, a motion for judgment as in case of nonsuit requires the trial court to determine whether the evidence, when taken in the light most favorable to the State, is sufficient to raise a legitimate inference, and to permit the jury to find that a defendant, after *premeditation* and *deliberation,* formed a fixed purpose to kill and thereafter accomplished this purpose. *State v. Britt, supra,* at 262, 204 S.E. 2d at 822. *Accord, State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975); *State v. Cooper, supra; State v. Sparks, supra; State v. Van Landingham,* 283 N.C. 589, 197 S.E. 2d 539 (1973); *State v. Johnson,* 278 N.C. 252, 179 S.E. 2d 429 (1971); *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541 (1970).

State v. Buchanan

, ,· All the evidence in the instant case discloses that defendant intentionally shot the deceased with a .12 gauge shotgun and that his death was proximately caused by a shotgun wound to the chest and the chest cavity. Hence, the only remaining question is whether the evidence was sufficient to permit a jury to find that defendant acted after due premeditation and deliberation.

G.S. 14-17, as presently written, provides in pertinent part as follows:

"A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, *or by any other kind of willful, deliberate and premeditated killing* . . . shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished by imprisonment for a term of not less than two years nor more than life imprisonment in the State's prison." (Emphasis supplied.)

In *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970), an opinion by Justice Sharp (now Chief Justice), this Court documented the history of G.S. 14-17 as follows:

"Prior to 1893 there were no degrees of murder in North Carolina. Any unlawful killing of a human being with malice aforethought, express or implied, was murder and punishable by death. *State v. Streeton,* 231 N.C. 301, 56 S.E. 2d 649; *State v. Dalton,* 178 N.C. 779, 101 S.E. 548; *State v. Rhyne,* 124 N.C. 847, 33 S.E. 128; *State v. Boon,* 1 N.C. 191. '*Malice aforethought* was a term used in defining murder prior to the time of the adoption of the statute dividing murder into degrees. As then used it did not mean an actual, express or *preconceived* disposition; but imported an intent, at the moment, to do without lawful authority, and without the pressure of necessity, that which the law forbade. *S. v. Crawford,* 13 N.C. 425. As used in C.S., 4200, now G.S. 14-17, the term *premeditation* and *deliberation* is more comprehensive and embraces all that is meant by *aforethought,* and more.' *State v. Hightower,* 226 N.C. 62, 64, 36 S.E. 2d 649, 650 (emphasis added); *accord, State v. Smith,* 221 N.C. 278, 20 S.E. 2d 313; *State v. Pike,* 49 N.H. 399; 6 Am. Rep. 533." *Id.* at 657, 174 S.E. 2d at 803-04.

The Act of 1893 was based on what has frequently been referred to as the "Pennsylvania pattern." *See, e.g.,* R. Perkins, Criminal Law 89 (2d ed. 1969) (hereinafter Perkins) ; Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U. Pa. L. Rev. 759 (1949). "The Pennsylvania statute [was] substantially the same as ours, and by that statute the first classification of criminal homicides into two degrees of murder and manslaughter was made in this country." *State v. Fuller,* 114 N.C. 885, 899, 19 S.E. 797, 801 (1894). The Pennsylvania Act was first adopted in 1794 and at the time of the ratification of Chapter 85, 1893 Public Laws, every other State had previously divided the common law crime of murder into two degrees. *State v. Fuller, supra,* at 902, 19 S.E. at 802. *See also* Perkins, *supra,* at 88. *See generally* W. LaFave & A. Scott, Criminal Law 562-68 (West 1972) (hereinafter cited as LaFave & Scott).

The Act of 1893 was first construed by this Court in *State v. Fuller, supra.* However, the term "premeditation and deliberation" was not construed until *State v. Thomas,* 118 N.C. 1113, 24 S.E. 431 (1896), the fourth decision of this Court interpreting the 1893 Act. In that case, this Court made the following pertinent observations:

" . . . In *S. v. Norwood,* 115 N.C., 789 . . . it was settled that if the prisoner once formed 'the fixed design to take life' it was immaterial how soon after deliberately determining to do so the purpose was carried into execution. . . .

\*    \*    \*    \*    \*

" . . . But this Court has never as yet ventured to give a more specific definition of the mental process which the Legislature intended to describe by the use of these words [premeditation and deliberation] than the general one given in *Fuller's case. It is inaccurate to say that, whenever there is an intent to kill, the homicide belongs to the class of murders in the first degree;* . . .

\*    \*    \*    \*    \*

". . . The word which marks distinctly the two degrees is 'premeditated' . . . . *'To say that murder was of the first degree, simply because it was intended at the moment . . . would be to construe the words "deliberate and premeditated" out of the statute.'* . . . 'An intent to kill may exist in other degrees of unjustifiable homicide, but in no other

degree is that intent formed into a *fixed purpose* by deliberation and premeditation.' [Citation omitted.] *This intent is defined by others as a steadfast resolve and deep-rooted purpose, or a design formed after carefully considering the consequences.* [Citations omitted.]

\*   \*   \*   \*   \*

" . . . In order to constitute deliberation and premeditation, something more must appear than the prior existence of actual malice or the presumption of malice which arises from the use of a deadly weapon. *Though the mental process may require but a moment of thought, it must be shown, so as to satisfy the jury beyond a reasonable doubt, that the prisoner weighed and balanced the subject of killing in his mind long enough to consider the reason or motive which impelled him to the act, and to form a fixed design to kill in furtherance of such purpose or motive.* [Citations omitted.]" (Emphasis supplied.) *See also State v. Rhyne,* 124 N.C. 847, 33 S.E. 128 (1899).

[2] In analyzing the Act of 1893 (now G.S. 14-17) it is clear that neither the statute nor the early court decisions interpreting it undertook to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would naturally vary with different individuals and under differing circumstances. Therefore, as this Court has stated on countless occasions, "premeditation means thought beforehand for some length of time, however short." *See, e.g., State v. Britt, supra; State v. Fountain,* 282 N.C. 58, 191 S.E. 2d 674 (1972) ; *State v. Johnson,* 278 N.C. 252, 179 S.E. 2d 429 (1971) ; *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487 (1970) ; *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541 (1970) ; *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769 (1961) ; *State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188 (1950) ; *State v. Wise,* 225 N.C. 746, 36 S.E. 2d 230 (1946) ; *State v. Hammonds,* 216 N.C. 67, 3 S.E. 2d 439 (1939) ; *State v. Lewis,* 209 N.C. 191, 183 S.E. 357 (1936) ; *State v. Steele,* 190 N.C. 506, 130 S.E. 308 (1925) ; *State v. Walker,* 173 N.C. 780, 92 S.E. 327 (1917) ; *State v. Roberson,* 150 N.C. 837, 64 S.E. 182 (1909) ; *State v. Daniel,* 139 N.C. 549, 51 S.E. 858 (1905) ; *State v. Hunt,* 134 N.C. 684, 47 S.E. 49 (1904) ; *State v. Cole,* 132 N.C. 1069, 44 S.E. 391 (1903) ; *State v. Caldwell,* 129 N.C. 682, 40 S.E. 85 (1901) ; *State v. Norwood,* 115 N.C. 789, 20 S.E. 712 (1894). However,

since the proscribed intent to kill must be turned over in the mind in order for the mental process of premeditation and deliberation to transpire, it is clear that some period of time must necessarily elapse. The true test is not the duration of time as much as it is the extent of the reflection. *See, e.g., People v. Thomas,* 25 Cal. 2d 880, 156 P. 2d 7 (1945). One commentator has suggested that for the premeditation the killer asks himself the question, "Shall I kill him?". The intent to kill aspect of the crime is found in the answer, "Yes, I shall." The deliberation part of the crime requires a thought like, "Wait, what about the consequences? Well, I'll do it anyway." LaFave & Scott, *supra,* at 563 fn. 5. We believe this analogy is in accord with the sound interpretation placed upon the Act of 1893 (now G.S. 14-17) in *State v. Thomas, supra.*

[3]   Applying these rules to the case *sub judice,* we must determine if there was sufficient evidence of premeditation and deliberation to carry the first-degree murder charge to the jury. "In passing upon the sufficiency of the State's evidence to carry the case to the jury, the trial court in the present case was not required to consider defendant's testimony concerning self-defense." *State v. Everette,* 284 N.C. 81, 85, 199 S.E. 2d 462, 466 (1973). Therefore, viewing the State's evidence in the light most favorable to the State, as we are bound to do, we hold it was sufficient to permit the jury to find that defendant acted after sufficient premeditation and deliberation. Specifically, the State introduced evidence that tended to show defendant knew the deceased had stolen wood on previous occasions; that on the day prior to the killing, defendant had secreted himself, with his shotgun, in a nearby field hoping to catch deceased stealing more wood; that on the day of the killing he saw deceased's truck pass by his home and back in the driveway of the Hooper place; that he thereafter got in his own truck and drove up to the Hooper place; that he parked his truck in front of the Hooper place in a manner so that the driveway was blocked; that he thereafter got out of his truck with a shotgun in his hands; that he told Robert Shook that he would blow his God damn brains out if he did not drop the wood he was carrying; that after Shook had thrown the wood down, he said: "God damn you, I'll kill you all"; that he then shot deceased, who was standing beside his Jeep truck; that he then reloaded his shotgun and told everyone to "move"; that he subsequently told Sheriff Holcombe that he did not see a weapon or anything else in the possession of deceased at or before the

fatal shot; that he failed to tell Sheriff Holcombe deceased had advanced on him at any time during the incident; and that he told Sheriff Holcombe: "I didn't look for any weapon, if a man tells me he is going to kill me, I'm not going to give him a chance." We believe that the jury could properly determine from this evidence that the killing resulted from suffiicent premeditation and deliberation to constitute first-degree murder. *See, e.g., State v. Sparks, supra; State v. Britt, supra, State v. Van Landingham, supra.* These first two assignments are therefore overruled.

[4] . In his final assignment (No. 3) defendant contends that the trial court erred in signing the judgment committing him to death by asphyxiation. Defendant makes no specific contention with respect to the validity of the death penalty. However, all possible contentions that defendant could present under this assignment have been considered and rejected by this Court in numerous recent decisions. *See, e.g., State v. Armstrong,* 287 N.C. 60, 212 S.E. 2d 894 (1975) ; *State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975) ; *State v. Woods,* 286 N.C. 612, 213 S.E. 2d 214 (1975) : *State v. Simmons,* 286 N.C. 681, 213 S.E. 2d 280 (1975) ; *State v. Lampkins,* 286 N.C. 497, 212 S.E. 2d 106 (1975) ; *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975) ; *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974) ; *State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974) ; *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974) ; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974) ; *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). Furthermore, we note that the killing occurred on 15 April 1974, subsequent to the effective date of Chapter 1201, 1973 Session Laws. Hence, the punishment was that prescribed by the Legislature. *See State v. Williams, supra.*

If this was not a capital case, then defendant's conviction would stand since we can find no error in the assignments brought forward. However, since this is a capital case, and in accord with the well-settled practice of this Court, we have elected to consider *ex mero motu* certain portions of the trial court's charge. In particular, we are concerned with the following quoted portions:

"Now, among the circumstances which you may consider in determining whether a killing was with premeditation and deliberation are, as the Court previously instructed you: One, lack of provocation on the part of the deceased;

Secondly, the conduct of the defendant, before and after the killing; Thirdly, the use of grossly excessive force; Four, any threats or declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased, and Five, *the dealing of lethal blows after the deceased has been felled and rendered helpless.*

"Now, the Court instructs you that *premeditation and deliberation may be inferred from a vicious and brutal slaying of a human being. . . ."*

After receiving the court's instructions the jury took a dinner recess, at the conclusion of which they retired to the jury room. Thereafter, at approximately 8:00 p.m., the entire jury panel returned to the courtroom, and with the defendant and his attorneys present in open court, the following proceedings took place:

"COURT: Mr. Foreman, the Court understands that the jury had a question—is that correct?

"JURY FOREMAN (GUY JONES): Yes, sir.

"COURT: What would that be, sir? If you would stand?

"JURY FOREMAN: Sir, the jury was in question on the five issues that were supposed to be proved without a reasonable doubt.

"COURT: The five elements of first degree murder?

"FOREMAN: Yes, sir.

"COURT: Do you want those reviewed, now?

"FOREMAN: Yes, sir.

"COURT: And just that, is that correct?

"FOREMAN: Yes, sir."

Following the above exchange, the court repeated in full its prior instructions pertaining to the elements the State must prove beyond a reasonable doubt in order to sustain a conviction of first-degree murder. Included in these subsequent instructions was the portion of the charge previously set out in full.

[5] Of course, ordinarily, it is not possible to prove premeditation and deliberation by direct evidence. Therefore these elements of first-degree murder must be established by proof of

circumstances from which they may be inferred. *See, e.g., State v. DeGregory,* 285 N.C. 122, 203, S.E. 2d 794 (1974) ; *State v. Britt, supra; State v. Van Landingham, supra, State v. Fountain, supra, State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393 (1971) ; *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970) ; *State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484 (1969). Among the circumstances to be considered by the jury in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of defendant before and after the killing; the use of grossly excessive force; or the dealing of lethal blows after the deceased has been felled. *See, e.g., State v. Walters, Id.* at 623-24, 170 S.E. 2d at 490; and the cases previously cited above.

However, we have held that "[a] trial judge should never give instructions to a jury which are not based upon a state of facts presented by some reasonable view of the evidence. When such instructions are prejudicial to the accused he would be entitled to a new trial. [Citations omitted.]" *State v. Lampkins,* 283 N.C. 520, 523-24, 196 S.E. 2d 697, 699 (1973). *Accord, State v. McClain,* 282 N.C. 396, 193 S.E. 2d 113 (1972) ; *State v. Jennings,* 276 N.C. 157, 161, 171 S.E. 2d 447, 449 (1970) ; *State v. Knight,* 248 N.C. 384, 103 S.E. 2d 452 (1958) ; *State v. McCoy,* 236 N.C. 121, 71 S.E. 2d 921 (1952) ; *State v. Wilson,* 104 N.C. 868, 10 S.E. 315 (1889). This rule is consistent with the following statement by this Court in *State v. Gaskins,* 252 N.C. 46, 48-49, 112 S.E. 2d 745, 747 (1960) :

"' . . . [E]vidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict, and should not be left to the jury.' *State v. Vinson,* 63 N.C. 335, 338. ' . . . [S]uch facts and circumstances as raise only a conjecture or suspicion ought not to be allowed to distract the attention of juries from material matters . . .' *Pettiford v. Mayo,* 117 N.C. 27, 28, 23 S.E. 252, 253."

In *State v. Cameron,* 284 N.C. 165, 171, 200 S.E. 2d 186, 191 (1973), this Court, in an opinion by Justice Branch, stated the rule as follows:

"G.S. 1-180 requires the trial judge to clarify and explain the law arising on the evidence and a trial judge should not give instructions to the jury which are not sup-

ported by the evidence produced at the trial. *State v. Jennings*, 276 N.C. 157, 171 S.E. 2d 447; *State v. Wilson*, 104 N.C. 868, 10 S.E. 315. *The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence."* [Citations omitted.]" (Emphasis supplied.)

[6]  In the instant case the court instructed the jury that they could "infer" premeditation and deliberation from "the dealing of lethal blows after the deceased has been felled and rendered helpless" and from the "vicious and brutal slaying of a human being." This instruction was not given once, but twice, the last being some forty minutes prior to the time the jury rendered a verdict of guilty of first-degree murder. The record is totally devoid of any evidence or reasonable inference that defendant assaulted deceased or otherwise "dealt lethal blows" upon his person after he had been "felled and rendered helpless." In fact, all the evidence shows that defendant, subsequent to the firing of the fatal shot, moved his truck, which was blocking the drive, so that the deceased and his companions could leave. Furthermore, the facts of this case fail to disclose a "vicious and brutal" killing in the sense those terms are usually employed. Considering all the evidence, there is no doubt but that the issues of "premeditation and deliberation" constituted the primary focus of the jury's inquiry. Therefore, we hold that the trial court's charge that the jury could infer these elements from matters not supported by the evidence constituted prejudicial error entitling defendant to a new trial.

Accordingly, for the reasons above stated, this case is remanded to the Jackson County Superior Court for a

New trial.